UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| VALERIE A. DARNELL,<br><br>            Plaintiff,<br><br>    vs.<br><br>NANCY A. BERRYHILL, ACTING<br>COMMISSIONER OF SOCIAL<br>SECURITY;<br><br>            Defendant. | 5:17-CV-05002-VLD<br><br><br>MEMORANDUM OPINION<br>AND ORDER |

## Table of Contents

INTRODUCTION......................................................................................... 1

FACTS ....................................................................................................... 2

   A.   Statement of the Case.......................................................... 2
   B.   Procedural History............................................................... 2
   C.   Background.......................................................................... 5
   D.   Medical Evidence – Chronological ........................................ 6
   E.   Claimant and Lay Witness Statements............................... 29

      1.   Valerie Darnell's Testimony........................................ 29
      2.   David Darnell's Testimony ......................................... 34

   F.   Opinion Evidence .............................................................. 35

      1.   Dr. McGee ............................................................... 35
      2.   Dr. Stacy ................................................................. 35
      3.   Dr. Doxsee............................................................... 37
      4.   Dr. Hamlyn .............................................................. 38
      5.   Dr. Bentham............................................................. 40

   G.   The Hearings ................................................................... 41

      1.   The First Hearing...................................................... 41
      2.   The Second Hearing.................................................. 42

H.    Issues Before this Court ................................................... 47

DISCUSSION ............................................................................ 47

A.    Standard of Review. ........................................................ 47
B.    The Disability Determination and the Eight-Step Procedure. .............. 49
C.    Burden of Proof. ............................................................ 50

    1.    Burdens Under the Eight-Step Procedure....................... 50
    2.    Presumption When Commissioner Seeks to Terminate Benefits....... 51
    3.    Substance Abuse Issues ........................................... 53

D.    Was the ALJ's Decision Supported by Substantial Evidence Given the Nature of Ms. Darnell's Mental Impairments?.......................... 53

    1.    Summary of the Medical Evidence ............................... 56
    2.    Summary of the ALJ's Treatment of the Medical Evidence............. 60
    3.    Analysis of the ALJ's Treatment of Medical Evidence...................... 61

E.    Did the Opinions of Dr. Pelc and Dr. Bentham Support the ALJ's Decision?...................................................................... 73

    1.    Does a Medical Expert Have to Consider Evidence Other than Medical Evidence in Completing a PRTF or Formulating Mental RFC?................................................................... 75
    2.    Did the ALJ Rely Solely on Dr. Pelc's Opinion at Steps 4 & 5? ........ 82

F.    Was a Finding of Disability Required Based on the ALJ's Evaluation of Dr. Hamlyn's Opinion? .................................................. 84
G.    Type of Remand.............................................................. 90

CONCLUSION .......................................................................... 92

**INTRODUCTION**

Plaintiff, Valerie Darnell, has filed a complaint seeking judicial review of the Commissioner's final decision denying her disability insurance benefits under Title II of the Social Security Act for the period from September 1, 2010, through October 24, 2011.[1] Ms. Darnell was previously found to be disabled as of September 1, 2004, and awarded benefits. Following the 14-month hiatus from September, 2010, to October, 2011, Ms. Darnell was again found to be disabled (as of October 25, 2011) and awarded benefits. Thus, this administrative appeal concerns only Ms. Darnell's entitlement to disability benefits during this 14-month middle interlude.

Ms. Darnell now moves the court for an order reversing the Commissioner's final decision and remanding with direction to award benefits. <u>See</u> Docket No. 12. Nancy Berryhill, the Acting Commissioner of Social Security ("Commissioner") urges the court to affirm her decision below.

This appeal of the Commissioner's final decision denying benefits is properly before the district court pursuant to 42 U.S.C. § 405(g). This matter is before this magistrate judge pursuant to the consent of both parties in accordance with 28 U.S.C. § 636(c). Based on the facts, law and analysis discussed in further detail below, the court reverses, remands and instructs

---

[1]Title II benefits are sometimes called SSD or DIB benefits. Receipt of these benefits is dependent upon whether the claimant is disabled. A claimant's entitlement to Title II benefits, unlike Title XVI (aka SSI) benefits, is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history.

that benefits be awarded for the period from September 1, 2010, to October 24, 2011.

## FACTS[2]

### A.   Statement of the Case

This is a request for review of a decision terminating benefits, and charging an overpayment. The ALJ partially revised the termination, finding that Ms. Darnell was not disabled from September 1, 2010 through October 24, 2011 – the relevant period. This resulted in Ms. Darnell being obligated for an overpayment for that period.

### B.   Procedural History

In 2005 Darnell applied for social security disability in Missouri. AR602, Ex. 5F/2. On July 21, 2005, a state agency found Darnell disabled as of September 1, 2004. AR65. On December 12, 2010, DDS found that disability had ceased on September 1, 2010. AR64.

Darnell requested that benefits continue until an ALJ could decide the case. AR478, Ex. 5E/1. Because the first decision was unfavorable, and the second decision was adverse for the period from September 1, 2010 through October 24, 2011, she incurred an overpayment and was liable to repay

---

[2] The court takes the following facts from the parties' Joint Statement of Material Facts, Docket No. 11, with minor changes in punctuation and headings. The glossary has been incorporated into the text of the facts rather than reproduced at the end. Exhibit numbers – where they exist – are juxtaposed with the AR page numbers because (1) the record has sub-optimal organization, (2) the ALJ decision and ME opinion cite exhibit numbers, and (3) the twin-citations will assist identification of the evidence to which the ALJ and ME refer.

benefits received for a 14-month period. AR478, Ex. 5E/1, ¶ 2. The amount of overpayment is not shown in the record.

The first ALJ's decision, dated October 18, 2012, noted the eight-step evaluation process for termination of benefits. AR53. ALJ James Olson found that on July 21, 2005, the "comparison point decision" (CPD), Darnell had bipolar disorder, panic disorder with agoraphobia, and history of substance abuse and alcohol abuse, that prevented completion of a normal work week. AR54. She still had these impairments. AR54. She did not meet a listing based on the opinion of Robert Pelc, Ph.D., that restrictions were mild to moderate. AR55.

Therefore, medical severity had decreased, and medical improvement had occurred as of September 1, 2010. AR55.

Darnell retained present counsel (AR108) on November 8, 2012. Not found in the record are: the request for Appeals Council review and multiple requests to access the electronic hearing record.

On July 2013, Darnell's counsel submitted Darnell's statement supplementing her testimony (AR149-56), Dr. Hamlyn's medical source statement dated December 14, 2012 (AR158-61), and a brief (AR163-85). On August 8, 2013, she submitted Dr. Hamlyn's reports from August 10, 2012 to May 10, 2013. AR186.

On August 27, 2013, the Appeals Council remanded the case to weigh Dr. Hamlyn's opinion, properly weigh David Darnell's statement that the first

ALJ had improperly weighed, and reconsider the first ALJ's flawed credibility assessment. AR105-07.

On August 12, 2014, Darnell had a hearing before Stanley R. Hogg, ALJ. AR985. Present and testifying were Valerie Darnell, represented by Attorney Catherine Ratliff; Jack Bentham, medical expert, and William Tysdal, vocational expert. AR987. Dr. Bentham opined that Darnell met disability criteria on and after October 25, 2011, but not from September 2010 to October 24, 2011, owing to absence of evidence for this period.

Counsel asked the ALJ to hold the record open for psychiatric evidence that she intended to submit. AR540, Ex. 18E/2. The ALJ's assistant called to inform counsel that it would not be necessary to submit this evidence because the ALJ was issuing a fully favorable decision. Id.

On September 4, 2014, ALJ Hogg issued a decision affirming the cessation of disability from September 1, 2010 to October 24, 2011, and finding that Darnell became disabled again on October 25, 2011. AR48.

Darnell requested Appeals Council review of the September 1, 2010, to October 24, 2011 period and submitted evidence from Darnell's family doctor dated November 2010 to September 2011, Two Rivers Psychiatric Hospital admission in June 2011, and her psychiatrist's July 2011 medical management note. AR538, Ex. 19E/1.

The Appeals Council declined review on August 24, 2016. AR5-9.

## C.    Background

Valerie Darnell was born in 1972, in Georgia, the youngest of three. AR857, Ex. 21F/17. She had panic attacks and hallucinations as a child, according to her treating psychiatrist's report of initial interview in October 2011. AR856, Ex. 21F/16; also at AR509, Ex. 11E ("I have always had the disorder even when I was younger"). By age 13 she had started to self-medicate with drugs and alcohol. AR856, Ex. 21F/16. She stated, "That took away some of the symptoms, hearing and seeing things that weren't there...." AR155. She reported sexual abuse by a cousin from age 8 to 11 and being raped at 13. AR857, Ex. 21F/17. At age 16 she attempted suicide and was psychiatrically hospitalized. AR604, Ex. 5F/4. She dropped out of 11th grade and later earned a GED. AR603, Ex. 5F/3. She reported that she finished beauty school but did not get a cosmetology license. Id. In her 20's, she worked in a day care center and appliance sales. Id. "Back when I worked, I had the same symptoms; I self-medicated with alcohol and drugs, I don't know how I worked.  Drinking helped calm the voices and flashes; how I interacted with other people I don't know." AR156. At age 21 she was using polysubstances and was in a chemical dependency treatment program. AR604, Ex. 5F/4; AR848, Ex. 21F/8.

She married David in 1994. AR603, 5F/3. Her husband owns his own roofing company. AR848, Ex. 21F/8. They have five children.

In October 2011, the family moved from Warrensburg, Missouri to Rapid City. AR64, 1010. Darnell engages in limited activities and the children are

self-sufficient. David works near home, his schedule is flexible, and he is supportive. AR151, 911, Ex. 24F/3.

## D.     Medical Evidence – Chronological

On October 1, 2004, Darnell saw Cindy Chu, MD[3], at SSM Health[4] clinic in Wentzville, Missouri. AR590, Ex. 4F/2. She complained of severe depression, hallucinations, and anxiety.  Id.  She could feel her moods surging more. She had a history of drug overdose and was status post rehab. She had recently moved from Colorado. About a year ago she re-started drinking and using illicit drugs. Id. She stopped completely when pregnant. She had no health insurance. Dr. Moore diagnosed panic attack, depression/anxiety. He increased Effexor[5], continued Ambien,[6] and started Risperdal.[7] Id. She was to return in one month. Id.

---

[3] https://www.healthgrades.com/physician/dr-cindy-chu-xy74l, accessed March 2, 2018.

[4] https://www.healthgrades.com/group-directory/momissouri/wentzville/ssm-health-medical-group-ff7de494, accessed March 2, 2018.

[5] Effexor (Venlafaxine) is an SNRI used to treat depression or generalized anxiety disorder, social anxiety disorder, and panic disorder. https://medlineplus.gov/druginfo/meds/a694020.html, accessed March 2, 2018.

[6] Ambien (Zolpidem) is a sedative-hypnotic used to treat insomnia. https://medlineplus.gov/druginfo/meds/a693025.html, accessed March 2, 2018.

[7] Risperdal (Risperidone) is an atypical antipsychotic used to treat symptoms of schizophrenia. It is also used to treat episodes of mania or mixed episodes of mania and depression that happen together. https://medlineplus.gov/druginfo/meds/a694015.html, accessed March 2, 2018.

On October 12, 2004, Darnell returned to the clinic and saw John Moore, M.D. AR591, Ex. 4F/3. She complained that her depression was getting worse even after Dr. Chu increased Effexor. "Risperdal not helping for hallucinations (sees insects, sees people trying to steal things in the house). She complained of panic attacks. Dr. Moore kept Effexor at 150 mg. and increased Risperdal to 2 mg. a day, adding Buspar 15 mg. for anxiety. Id.

On October 22, 2004, Darnell returned to the clinic complaining of severe depression, waking at night and being unable to go back to sleep and continuing to hear voices. The increased dose of Risperdal was not helping. AR592, Ex. 4F/4. Dr. Moore diagnosed depression with anxiety, some psychotic features. He stopped Risperdal and started Zyprexa[8] 5 mg. Id.

On October 29, 2004, Darnell told Dr. Moore the hallucinations had decreased and she still had trouble with sleep. Her anxiety was somewhat less. Dr. Moore decided to hold off on Wellbutrin[9] for now. He noted that an increase of Effexor might help but he would wait as she was pregnant. AR593, Ex. 4F/5.

On November 18, 2004, Darnell saw a therapist, J. Milhaus, BC, FNP, upon referral from Dr. Moore. AR594-96.

> For past 6 mos has had positive sxs. Had tried Risperdal [and had increased] hallucinations. Hears people whispering. Sees

---

[8] Zyprexa (Olanzapine) is an atypical antipsychotic used to treat symptoms of schizophrenia. It is also used to treat bipolar disorder. https://medlineplus.gov/druginfo/meds/a601213.html, accessed March 2, 2018.

[9] Buspar (Buspirone, Wellbutrin) is used to treat anxiety disorders. https://medlineplus.gov/druginfo/meds/a688005.html, accessed March 2, 2018.

> "something" come up behind her, sees hands coming out of holes
> in walls, or someone trying to steal TV. Has a mixture of highs &
> lows.... [Husband] never knew of hallucinations - he thought mood
> swings were due to alcohol & drugs. They have separated twice in
> 3 yrs.... In 1999 had prozac x 2 m - it didn' work.... Zoloft didn't
> work.... Hallucinations & voices have slowed down since starting
> meds. Is now sleeping better. No anxiety attacks x 2-3 weeks.
> Believes medications are helping. [Husband] also states they are
> helping – he additionally voiced concerns about continuing
> marriage due to these problems & especially past problems w/
> alcohol & drugs.... MS - Alert, coherent, flat affect. Imp: psychosis
> NOS, Schizophrenia Provisional. Plan - increase Zyprexa to 10mg.

AR596, Ex. 4F/6.

On December 2, 2004, Darnell told her therapist that she was about the

same. AR598, Ex. 4F/10.

> Sometimes voices in her head try to turn her against [husband] -
> "like he's the enemy but he's not!" Hears voices more often when
> he's home - she takes things negative, like a verbal attack - but
> she knows it's not. Voices are also present at other times.... Still
> occasionally sees things - shadows, or see ants at the coffee pot -
> covered holes in walls, no longer sees hands coming through walls.
> Has rearranged furniture so she doesn't feel that people are coming
> up behind her.

Darnell told her therapist that she had been sexually abused for three

months at age nine. "No one else knows about that." Anxiety had been bad and

she woke at night in a panic. "Husband tells her she's not breathing & he waits

for her to start breathing again." She was taking Ambien. She had a flat affect.

J. Milhaus planned to increase Zyprexa and Buspar. AR597-98, Ex. 45F/9-10.

On February 10, 2005, J. Milhaus stated that Darnell had a baby in

January and now had five children. AR597, Ex. 4F/9. She continued on

Effexor, Buspar and Zyprexa. "Visual, auditory halluc. very disturbing, worse

when [pregnant?] - happened when younger, going back to 7-8 y/o - plus lots

of panic sxs. She had turned to drugs and alcohol and left school in eleventh grade because she "lost interest in everything." Id. On her father's side there was "lots of alcohol" and a cousin had committed suicide at age 19. Id. She said she was taking care of the baby okay and had some difficulty caring for the other kids. AR599, Ex. 4F/11. The therapist observed depressive affect. Her impression was "Bipolar I" and she added Lamictal[10] to the medication regimen. Id.

The nurse-practitioner-therapist adjusted medications two more times that month. AR599, Ex. 4F/11.

On March 8, 2005, Darnell told J. Milhaus that her anxiety was still bothering her, her heart rate was increased, her hands shook, she had loss of appetite and short temper during anxiety. AR600, 4F/12. Her husband was home more, helping. Darnell said she was more depressed, her hallucinations were decreased but sometimes increased with anxiety, and she had experienced "4 panic attacks" since her last visit. Ativan helped initially. The therapist reported flat affect. Her impression continued to be "Bipolar." She increased Lamictal to 100 mg. Id.

---

[10] Lamictal (Lamotrigine) is an anticonvulsant used to increase the time between episodes of depression, mania, and other abnormal moods in patients with bipolar I disorder. It is not effective when people are experiencing the actual episodes so other medications must be used to help people recover from these episodes. https://medlineplus.gov/druginfo/meds/a695007.html, accessed March 2, 2018.

On March 10, 2005, the therapist recommended a sleep study and referred Darnell to Dr. Breschetto at SJMH, Washington, Missouri. AR600, 4F/12.

In June 2005, the Missouri state agency sent Darnell for a psychological consultative examination with Michael Armour, Ph.D. AR602, Ex. 5F/2. At this time she was on psychotropic medications prescribed by Dr. Chu and Dr. Crane[11], her treating psychiatrist: Ambien, Oxazepam, Zyprexa, Effexor, Lamictal, and Buspar. AR604, Ex. 5F/4.

When Darnell saw Dr. Armous she described panic attacks two to three times a week when her heart raced, she broke out in a sweat, had tremors and shortness of breath, and urinated on herself. AR604, Ex. 5F/4. After a panic attack she was "jittery." AR605, Ex. 5F/5. She would call her husband to come home. Id. At times she stayed home out of fear of having a panic attack. Id.

When her mood was "down," Darnell related, she did not talk to others, isolated, had crying spells and no energy, and neglected her hygiene. When her mood was up she talked "real fast," jumped from topic to topic, had increased energy and could go without sleep for two days. AR604, Ex. 5F/4. She stated that her concentration was poor regardless of whether her mood was up or down. Id. On this day her mood was "in the middle." Id.

Darnell told Dr. Armour "that her panic attacks, ongoing anxiety, and not feeling safe all contribute to her not being able to work." AR605, Ex. 5F/5. She denied "first rank symptoms" of psychotic thought disorder. Id.

---

[11] Dr. John Crane's reports are not in the record.

Dr. Armour reported his mental status examination:

She was cooperative with the evaluation and responded to the questions in an appropriate manner. Her speech was of a normal rate, rhythm, and volume. She did not display signs of loose associations, tangential thinking, or circumstantial thinking. Her speech overall was organized and her responses were relevant and coherent. Her mood was subdued. Her affect was limited in terms of range in that she did not show much emotional variation, but the emotion she did express was appropriate to the emotional tone of the subject matter. When asked about first rank symptoms indicative of an ongoing psychotic thought disorder, Ms. Darnell denied experiencing audible thoughts, thought broadcasting, thought insertion or withdrawal, or thought control. When asked about auditory or visual hallucinations, she stated that she hears children calling her name. She stated that she sees things "over her shoulder" and this occurs at night. One to two times per month she sees people "moving in the room." She stated that she has concerns that others are out to harm her but vague in providing details about beliefs. She did not present this concern as a more systematized delusional belief.

AR605, Ex. 5F/5.

Darnell reported that her sleep pattern was variable. Id. Dr. Armour estimated that her intellect was low-average to average. AR606, Ex. 5F/9. Her immediate memory appeared intact. She could recall three out of three objects immediately, two out of three after five minutes, and long-term memory appeared intact based on her ability to report her history. Id. Dr. Armour assessed insight and judgment as impaired at times by her depressive symptoms. Id.

Dr. Armour diagnosed bipolar one disorder with psychotic features; panic disorder with agoraphobia; alcohol and cocaine abuse, and sexual abuse as a child. GAF 45-50.[12] AR606, Ex. 5F/6.

Dr. Armour assessed "moderate to at times severe impairment" in social functioning. He assessed "at least moderate impairment" in concentration, persistence or pace "depending upon the fluctuating severity of her mood symptoms." AR607, Ex. 5F/7. He assessed three areas of mental residual functional capacity (MRFC). AR608-09, Ex. 5F/7-8. Ability to understand and recall instructions was mildly to moderately impaired. AR607, Ex. 5F/7. Ability to sustain concentration and persistence was moderately to at times severely impaired. Id. Ability to interact socially and adapt to her environment was severely impaired for these reasons: ongoing problems isolating, interacting only with her family, and beliefs about people being in her residence, and – although she appeared able to care for her residence – she reported fluctuating mood and impaired ability to interact with others, and panic attacks when she would call her husband to come home. AR607-08, Ex. 5F/7-8.

---

[12] GAF stands for Global Assessment of Functioning.  GAF scores range from 1 to 100, with 100 representing the highest of social and occupational functioning.  See https://www.webmd.com/mental-health/gaf-scale-facts, last checked March 2, 2018.  GAFs and their significance are discussed at greater length in the Discussion section of this opinion.

In 2009-10 Darnell's family physician, Syed Hasan, M.D., treated her anxiety with Xanax, [13] fluctuating moods with Lithium,[14] and psychotic symptoms with Seroquel.[15] AR610-33, Ex. 7F. By January 2010, Dr. Hasan stated that she seemed to be more depressed. "She was feeling much better earlier however seems to be more depressed." Id. She was on four medications for bipolar disorder – Lamictal, Lithium, Seroquel, and Abilify,[16] plus Effexor. AR614, Ex. 7F/5. Dr. Hasan increased her Seroquel dose. Id. He wrote, "She does not want to see a psychiatrist. Will monitor very closely." Id.

On March 3, 2010, Darnell told Dr. Hasan that her depression and anxiety had markedly improved at this time. AR613, Ex. 7F/4.

---

[13] Xanax (Alprazolam) is a benzodiazepine used to treat anxiety disorders and panic disorder. https://medlineplus.gov/druginfo/meds/a684001.html, accessed March 2, 2018.

[14] Lithium is in a class of medications called antimanic agent and is used to treat and prevent episodes of mania. https://medlineplus.gov/druginfo/meds/a681039.html, accessed March 2, 2018.

[15] Seroquel (Quetiapine) is an atypical antipsychotic used to treat symptoms of schizophrenia. It is also used to treat episodes of mania or to prevent episodes of mania. https://medlineplus.gov/druginfo/meds/a698019.html, accessed March 2, 2018.

[16] Abilify (Aripiprazole) is an atypical antipsychotic used to treat symptoms of schizophrenia. It is also used to treat episodes of mania or mixed episodes of mania and depression. It is also used to treat children who have Tourette's. https://medlineplus.gov/druginfo/meds/a603012.html. The recommended starting and target dose is 10-15 mg. a day and it has been shown to be effective in a dose range of 10 mg. to 30 mg. a day. https://medlineplus.gov/druginfo/meds/a603012.html, accessed March 2, 2018.

On May 5, 2010, she saw a Kansas City psychiatrist, Michael Everson, MD. AR634-38, Ex. 8F/1. Dr. Everson listed her symptoms: mind racing, sleep disorder, reckless behavior, sexual and drug use, big mood swings, increased spending, panic attacks, lots of anxiety, excessive worry, depressed or sad mood, and irritability. AR634, Ex. 8F/1. Dr. Everson diagnosed bipolar mood disorder, panic disorder, and generalized anxiety disorder, and assigned Darnell a current GAF score of 70. AR638, Ex. 8F/5. Dr. Everson recommended medications: Xanax, Lamictal, Abilify, Seroquel, and Neurontin.[17] AR638, Ex. 8F/5.

On May 8, 2010, Dr. Hasan said she seemed more sleepy and was "pretty concerned about her medications." AR645, Ex. 9F/7. Dr. Hasan stated that Dr. Everson had recommended counseling and she did not want to do that. She remained anxious. Id.

On May 18, 2010, Dr. Hasan saw Darnell for chest pain, palpitations and dizziness. AR644, Ex. 9F/6. She had been to the ER for this and continued to have chest pain radiating to her back. Id. She was still "pretty depressed. At times she will be laughing. At times she will be sleeping.... She does not like the medication changes which were done by Dr. Everson." She wanted to go back on her previous medications. Id. Dr. Hasan resumed Lithium and held Neurontin and otherwise continued the medication regimen. Id. Darnell's chest pain was significant enough that from May to July 2010, she was worked up

---

[17] Neurontin (Gabapentin) is an anticonvulsant also used to treat nerve pain. https://medlineplus.gov/druginfo/meds/a694007.html, accessed March 2, 2018.

for heart disease and had an abnormal nuclear stress test but normal coronary arteries. AR641-43, 676-78, 680-82; Ex. 9F/3-5, 13F/10-12, 14-15. She did not return to Dr. Everson.

In August 2010, Dr. Hasan said her depression and anxiety had markedly improved and that her depression was stable. AR673, Ex. 13F/7.

In November 2010, he said she was feeling better, her mood was stable, and she denied any suicidal ideations, thoughts, or plans, but that she felt very weak, tired, lethargic, and "gets pretty tired, weak and more suicidal." AR671, Ex. 13F/5. He noted, "She cannot even work a few hours. She tried to help her sister-in-law. However, she could not do it." Id. He renewed her Seroquel and Xanax, and added vitamin D 50,000 units a week for 12 weeks. Id.; AR968, Ex. 30F.

In January 2011, she had a diagnostic interview by a therapist who recorded symptoms including feeling sad, tired, tearful, worthless, hopeless, with loss of interest, withdrawal from others, difficulty concentrating and making decisions, confusion, racing thoughts, recurring worry, anxiety and irritability. AR798, Ex. 15F/5. She used drugs in a binge pattern. She had been convicted of a felony for assaulting her husband. Id. "Valerie automatically turns to drugs to manage her emotions." AR800, Ex. 15F/7. In interview she was intensely emotional. Id. On mental status she was angry/irritable, depressed, agitated, forgetful, indecisive, had loss of interest and motivations, and woke fatigued. AR801, Ex. 15F/8. GAF was assessed at 35. AR803, Ex. 15F/7.

On February 9, 2011, Darnell saw Dr. Hasan. "She was more depressed. She has been seeing a counselor. She had separated from her husband for a month. Impressions included depression, anxiety, and bipolar disorder. AR966, Ex. 30F.

On February 13, 2011, the therapist assessed GAF 35, "severe depressive symptoms." AR800, 803; Ex. 15F/7, 10. The anticipated completion of treatment was April 2011. Id. At her third session, the therapist stated that the client reported feeling confused as to whether she should rent an apartment, and nervous about staying in the family residence; she appeared worried and appeared to be gaining new awareness of the reasons for her behaviors and was learning techniques to manage challenges. GAF was assessed as 45. AR797, Ex. 15F/4.

On February 16, 2011, Dr. Hasan recorded complaints of occasional weakness, tiredness, fatigue, and dysuria, but better-controlled depression and anxiety. Impressions included bipolar disorder, depression and anxiety. AR969, Ex. 30F.

On March 10, 2011, Dr. Hasan stated that her mood was "pretty stable at this time." He treated her for a virus and back pain. Impressions included depression, anxiety, bipolar disorder, severe anxiety disorder, insomnia, and hypothyroidism. AR967, Ex. 30F.

On April 14, 2011, Darnell went to Dr. Hasan with complaints of weakness, tiredness, fatigue, and hot flashes. She had been taking her medications regularly and trying to watch her diet. AR965, Ex. 30F.

From June 2-9, 2011, Darnell was hospitalized at Two Rivers Hospital, a mental hospital. AR 970, Ex. 31F/1.

Mohammed Mirza, M.D., attending psychiatrist, reported a psychiatric evaluation on June 2, 2011. AR978-79, Ex. 31F. Darnell told him that she was bipolar, had been using meth for six months, had mood swings, was paranoid, hearing voices and seeing people. She said she was tearful, and that she had a lot of trauma issues. "Everybody is telling me I'm an addict but they don't focus on my abuse. I've had a lot of abuse...." AR978, Ex. 31F. Dr. Mirza noted the psychiatric history. He reported that Darnell had pressured speech, and was somewhat upset and tearful, "so we are not able to get more detailed information, but she is intelligent, motivated, wants to get help." Id.

Darnell told Dr. Mirza that she had been drinking for six months and recently had been using a quarter ounce to an ounce of meth every two or three days. Dr. Mirza noted the history of childhood physical and sexual abuse. Dr. Mirza recommended inpatient treatment and a program including OT/RT, individual and group therapy in the Dual Diagnosis Program "until we can transfer her to Trauma." AR979, Ex. 31F.

Jonas Bustos, MD, reported Darnell's admission history and physical on June 3, 2011. AR980, Ex. 31F. She complained of agitation, depression, anxiety, feeling out of control, feeling things crawling in her skin, and auditory and visual hallucinations. She had not taken her medications for five to seven days. She had a history of sexual, physical, and emotional abuse. She had

panic episodes, flashbacks, difficulty concentrating, racing thoughts, insomnia, and agitation. She was on daily doses of Lithium 600 mg., Xanax 4 mg., Seroquel 900 mg., Lamictal 400 mg., and Effexor 300 mg. She had been sober from alcohol for a year and smoked a pack a day. Id. Dr. Mirza diagnosed psychosis, rule out bipolar disorder and other non-relevant medical diagnoses. She would be admitted to treat her psychosis.

Dr. Mirza wrote the discharge summary. AR972-73. Dr. Mirza noted that she had seen a psychiatrist and nurse practitioner in St. Louis and then moved to Warrensburg and saw Dr. Hasan but not a psychiatrist. She had seen Dr. Everson once and did not like him. AR972, Ex. 31F. During this hospitalization, Dr. Mirza discontinued Risperdal and Lithium and added Seroquel, Xanax, Depakote[18] and Effexor. He decreased her Seroquel and Xanax during the hospitalization. Id. In her discharge summary, Dr. Mirza decided that she was "not ready for trauma issues, and needed to get her addiction more stabilized and continue to work on her bipolar disorder." AR973, Ex. 31F.  She would follow up with him (Dr. Mirza) on July 7, 2011, and would follow up with inpatient CD rehab at Turning Point Hospital in Moultrie, Georgia. She was discharged on Xanax, Seroquel, Effexor, Depakote, thyroid supplement and a statin. Discharge diagnoses included bipolar mood

---

[18] Depakote (Valproic Acid) is an anticonvulsant also used to treat mania. https://medlineplus.gov/druginfo/meds/a682412.html, accessed March 2, 2018.

disorder, rapid cycling, with psychosis, resolved. GAF was 50 and prognosis was guarded. AR973, Ex. 31F.

Her discharge papers said she would follow up with Dr. Mohammed Mirza; Pathways of Warrensburg, MO, therapists; and inpatient CD rehab at Turning Point Hospital in Moultrie, GA. AR974, Ex. 3F. Her goals for recovery were: "Stay around family more, spend alone time in room." Id.

On June 14, 2011, Dr. Hasan saw Darnell for medical reasons (back and hip pain) and noted her recent discharge from Two Rivers Hospital. "She is going to follow with the psychiatrist and counselor. She is going to go to the alcohol and drug rehab program. Multiple centers have been contacted." Impressions included alcohol and drug abuse, depression, anxiety, and bipolar disorder. AR964, Ex. 30F.

On July 2, 2011, Dr. Mirza saw Darnell in follow-up. "She went to Georgia, learning point." AR983. She was on Depakote, Seroquel, and Geodon.[19]  She stated, "I am feeling negative about the program here." She was "less labile some hallucination[s]." Assessment was bipolar [unreadable] psychosis]. The plan was to increase Geodon and add Effexor and Remeron. Id.

---

[19] Geodon. Ziprasidone [Geodon] is used to treat schizophrenia. https://medlineplus.gov/druginfo/meds/a699062.html, visited March 2, 2018. "Efficacy in schizophrenia was demonstrated in a dose range of 20 mg to 100 mg twice daily in short-term, placebo controlled clinical trials. There were trends toward dose response within the range of 20 mg to 80 mg twice daily, but results were not consistent. An increase to a dose greater than 80 mg twice daily is not generally recommended. The safety of doses above 100 mg twice daily has not been systematically evaluated in clinical trials." http://dailymed.nlm.nih.gov/dailymed/lookup.cfm?setid=75e6a13c-39a7-4df0-b39a-b65b8bd7f618, visited March 2, 2018.

On August 22, 2011, Dr. Hasan saw Darnell for medical treatment and noted that she was "following with her psychiatrist." AR963, Ex. 30F. In fact, she has an appointment on 9/26/11. She has been taking Geodon 120 mg., Effexor 10 mg., and Risperdal [?] 30 mg. and her mood was "pretty stable." Id.

On September 9, 2011, Dr. Hasan saw Darnell for the last time. He wrote, "Has been following with the psychiatrist on a regular basis." AR962, Ex. 30F. His impressions on this date, the last time he saw Darnell, were right shoulder pain, bipolar disorder, hypothyroidism, depression, anxiety and history of substance abuse. Id.

Darnell and her family moved to Rapid City, SD. On October 25, 2011, she was seen at Rapid City Regional Behavior Health by Harry Hamlyn, MD, board-certified psychiatrist[20]. AR856, Ex. 21F/16. Dr. Hamlyn recorded a history of bipolar disorder that Darnell thought had started in her twenties and she gave history of panic attacks and hallucinations in childhood. He recorded her drug and alcohol history since age 13 and that bipolar disorder was diagnosed and she was placed on medications at age 33. AR856, Ex. 21F/16.

Dr. Hamlyn noted, "She still has some issues with chemical dependency problems, but has been clean completely since June 1, 2011." She still had bipolar symptoms, and reported auditory hallucinations of voices and visual hallucinations and said she could not watch television "because she sees and

---

[20] http://health.usnews.com/doctors/harry-hamlyn-550539, accessed March 2, 2018.

hears things different than what other people see and hear." AR856, Ex. 21F/16.

"She has panic attacks occasionally. She does still have some highs and lows in her mood and sometimes has episodes where she wants to isolate herself ... perhaps once or twice a week." In the past she was suicidal but not lately. Darnell told Dr. Hamlyn that sometimes she had mixed episodes with highs and lows together, sometimes manic episodes alone, sometimes depressive episodes alone. "When she has a high, she will have racing thoughts and hyperactivity and rapid speech and impulsivity and then of course when the hallucinations went down, she will have low energy level and poor motivation and suicidal thinking. She tries to keep busy when she is depressed." She felt that her sleep was poor but she was sleeping from 9 p.m. and waking about 4:30 a.m. AR856, Ex. 21F/16.

Darnell related to Dr. Hamlyn that her energy level during the day was fairly good and her appetite and weight were stable. AR856, Ex. 21F/16. Her concentration was "okay currently, but at times she has difficulty with that when she is in the midst of an episode. She is able to enjoy herself. She relates that she gets along well with her husband." AR856-57, Ex. 21F/16-17.

Dr. Hamlyn noted the "lots of different medications" that had been tried in the past "including Lithium, Lamictal, Xanax, Seroquel, Risperdal, Zyprexa,

Abilify, Geodon, Trazodone,[21] and Ambien. She likes her current medications of Remeron, Effexor and Geodon." AR857, Ex. 21F/17.

Darnell told Dr. Hamlyn that her last hospitalization was at Two Rivers Psychiatric Hospital in Kansas City, Missouri and that she had been sober and clean since then. AR857, Ex. 21F/17. Dr. Hamlyn noted Darnell's developmental history, education and work history, family history, other medical history (hypothyroidism, GERD, cholecystectomy, five pregnancies and total hysterectomy with bilateral salpingo-oophorectomy), and current living arrangements. Id. He noted her legal history, a domestic violence charge in Colorado, and a DUI in Colorado eight years ago. AR858, Ex. 21F/18.

Dr. Hamlyn noted Darnell's alcohol and substance abuse history. "At the worst, she was a daily drinker, had blackouts, withdrawal symptoms, and morning drinking. She had used cocaine, methamphetamine, crack cocaine, LSD, and mushrooms. She had not used drugs since June 1, 2011. She did smoke a pack a day and drank up to six cups of coffee daily and two cans of pop. She had never had a problem with gambling. AR858, Ex. 21F/18.

Dr. Hamlyn reported his mental status exam. Darnell was alert, eye contact was good, motor level was normal, and affect was appropriate to a mildly anxious mood. Speech was normal, associations were logical, stream of thought was unremarkable, and thought content showed no overt delusions.

---

[21] Trazodone (Desyrel) is a serotonin modulator used to treat depression. https://medlineplus.gov/druginfo/meds/a681038.html, accessed March 2, 2018.

She admitted having auditory and visual hallucinations off and on even when her mood was relatively stable. She was oriented to person, place and time; concentration was good; memory was grossly intact; fund of knowledge was good; and insight and judgment were intact. AR858, Ex. 21F/18.

Initially, Dr. Hamlyn diagnosed bipolar disorder, depressed, in partial remission with psychotic features, and polysubstance and alcohol dependence in remission since June 1, 2011. He noted mild to moderate stressors of just moving from Missouri and worry about a court case involving SSD. He assessed GAF as 60. AR858-59, Ex. 21F/18-19.

Dr. Hamlyn increased her Geodon to 160 mg. to help mood stabilization, hallucinations and sleep. He increased Remeron to 30 mg. to help sleep and mood stability. He continued the current dose of Effexor 30 mg. AR859, Ex 21F/19.

In November 2011, Dr. Hamlyn wrote, "She relates that she is feeling much better from the standpoint of her anxiety. She still has the auditory hallucinations of voices but it does not occur often and she is avoiding watching television because that is when it will occur the most." AR860, Ex. 21F/20. He continued the diagnosis and added Wellbutrin to her medication regimen. Id.

In December 2011, Dr. Hamlyn stopped Wellbutrin and increased Geodon to 240 mg.[22] because:

---

[22] This is a high dose. "Efficacy in schizophrenia was demonstrated in a dose range of 20 mg to 100 mg twice daily in short-term, placebo-controlled clinical trials. There were trends toward dose response within the range of 20 mg to 80

23

Ms. Darnell complains of having a lot of anxiety and also racing thoughts and starting to have a visual hallucinations. She sees bugs crawling around the coffee pot. She also is hearing voices and has a difficult time watching television because they are saying different things than what they are supposed to be saying. It is as though she is going back into another episode of her illness. I told her this may be partly a side effect Wellbutrin and she should stop it immediately. She finds herself feeling more depressed since starting Wellbutrin rather than feeling better.

AR862, Ex. 21F/22.

Dr. Hamlyn continued seeing Darnell monthly, adjusting her medications. AR864-66, Ex. 21F/24-26. In February 2012 she was not having hallucinations, her mood was stable, and she wanted to try volunteer services.[23] AR866, Ex. 21F/26. Psychiatric appointments would be decreased to bimonthly. She was still feeling fairly good and hallucination-free in April and June 2012. AR868, Ex. 21F/28.

In August 2012 Darnell told Dr. Hamlyn that she had been feeling anxious as she was having auditory hallucinations off and on, usually daily, since going off Geodon, which was too expensive during the "donut hole," and starting Risperdal. "She feels the Risperdal is just not strong enough to control the voices." AR847, Ex. 21F/7.

---

mg twice daily, but results were not consistent. An increase to a dose greater than 80 mg twice daily is not generally recommended. The safety of doses above 100 mg twice daily has not been systematically evaluated in clinical trials." http://dailymed.nlm.nih.gov/dailymed/lookup.cfm?setid=75e6a13c-39a7-4df0-b39a-b65b8bd7f618, visited March 2, 2018.

[23] She didn't try it then, but in January 2013, she tried to apply for community service at the Salvation Army: "I freaked out and had a panic attack, and turned and walked out the door and sat in the car and tried to gather my thoughts in order to be able to calm down and drive myself home." Darnell Statement, AR154-55.

Dr. Hamlyn changed Darnell's diagnosis from bipolar to schizoaffective disorder, DSM IV 295.70. AR849, Ex. 21F/9. He explained the reason for change of diagnosis: She had been psychotic for one month without having a major depressive or manic episode. He assessed a GAF of 50. He increased Risperdal and continued Remeron, Effexor, and Abilify. Id.

Dr. Hamlyn stated: "I do feel that Ms. Darnell is not capable of any type of job in the community. Even when she was not having any hallucinations, her ability to handle stress was such that she could just handle her activities of daily living at home, but I do not think she is capable of working at any job." AR849, Ex. 21F/9.

Before her remand hearing, on November 14, 2013, ODAR[24] arranged a psychological CE by Greg Swenson, Ph.D., a Rapid City psychologist. AR909-13. Ex. 24F. Darnell described a more detailed history of her childhood hallucinations and how she coped by sleeping in her brother's room. She thought she saw people come and take things out of his room. AR910, Ex. 24F/2.

Dr. Swenson recorded developmental and family history. Darnell had grown up in Adel, Georgia, where her father worked in manufacturing and her mother worked in a variety of jobs. She had a brother a year older and a sister four years older. AR910, Ex. 24F/2. She had friends outside the home, engaged in a few social activities and went to school where she frequently would "see things on her paper and tried to brush them off," distracting other students.

---

[24] Office of Disability Adjudication and Review.

She said she was able to maintain A and B grades, did cheerleading for a year and a half, felt inferior to other classmates, and had a steady boyfriend for a time. AR910, Ex. 24F/2.

When she was 17 her mother left her father and Valerie lived with her mother in Denver. She had finished eleventh grade and did not return to school. At age 21 she earned a GED. AR910, Ex. 24F/2.

In Denver she worked in a restaurant, day care facilities, and did sales for an appliance company. She lived with her mother until age 23 when she married her husband. She had five children. AR910, Ex. 24F/2.

Darnell told Dr. Swenson that she "consumed alcohol to excess, as it alleviated her unpleasant moods. She felt that cannabis use enabled her to be free of hallucinations for periods of time.[25] She took excessive Xanax, obtained from a friend, to alleviate anxiety. This resulted in a brief treatment program focused on suicide. She continued polydrug use and believed it was an attempt to alleviate hallucinations and severe mood fluctuations. She stopped using drugs during her pregnancies and resumed drugs after giving birth. AR910, Ex. 24F/2.

During this period "Valerie's husband believed that she was experiencing a significant psychological disorder [and] tried to convince her to seek mental

---

[25] This effect is consistent with a 2013 study based on brain imaging and a 2010 study based on neuropsychological testing, cannabis had a protective effect on the brains of schizophrenics.
http://www.ncbi.nlm.nih.gov/pubmed/23672820,
http://www.ncbi.nlm.nih.gov/pubmed/20483565. Other studies disagree and there appears to be no consensus.

health treatment. Valerie resisted until she finally capitulated in 2005." She was placed on psychiatric medications but continued to use illicit drugs and excessive alcohol until 2011. She was arrested on drug charges which required participation in Narcotics Anonymous. AR910, Ex. 24F/2.

"At this point, Valerie feels that she 'surrendered,' and reports that she has maintained sobriety for two and a half years." AR911, Ex. 24F/3. She believed that her current combination of medications worked pretty well. She experienced less frequent visual hallucinations and mood fluctuations were muted. "When depressed, she spends much of her time in bed and engages in little productive activity. After several days of depressed mood, she usually moves into an active phase, during which she is more energetic, able to do some housekeeping, and is more animated. This rapid-cycling pattern has characterized Valerie throughout her life." AR911, Ex. 24F/3.

Darnell told Dr. Swenson that she relied on her husband and children to perform most household tasks. "The only thing I do is prepare a meal with my husband and take the children to school." AR911, Ex. 24F/3. She did laundry for herself and her husband and the children did their own. Her husband managed all financial matters. Valerie shopped for groceries with her husband. AR911, Ex. 24F/3.

On mental status examination, she appeared tired and somewhat older than her age, mobility and posture were normal; grooming, hygiene, and dress were appropriate; facial expression and eye contact were normal; she understood questions and responded appropriately; speech was normal.

AR911, Ex. 24F/3. She demonstrated significant impairment in attention. She was able to repeat only three digits in forward sequence accurately, and only two digits in reverse sequence accurately. Her immediate recall for a short story was poor. She was able to recall only a few words from the story, missing many of the basic features.

Her short-term memory and remote memory were "adequate," and recent memory for activities from the previous day was good. AR911-12, Ex. 24F/3-4. "Informal assessment indicates some degree of impairment in comprehension, reasoning, judgment, factual knowledge, vocabulary knowledge, and calculations." AR912, Ex. 24F/4. Dr. Swenson estimated intelligence as borderline to low average. Id.

Dr. Swenson reported that energy level, motivation and pace were all below average. She had insight. Her thought processes appeared normal. Affect was appropriate with limited animation and mood was serious and depressed. AR912, Ex. 24F/4.

Dr. Swenson diagnosed bipolar I disorder, most recent episode depressed, moderate with mood-incongruent psychotic features; and amphetamine dependence in sustained remission. AR913, Ex. 24F/5. Her prognosis was "guarded."

Dr. Swenson completed a mental RFC assessment. AR914-16, Ex. 24F/6-8. He assessed "marked" limitations in ability to understand and remember simple instructions and to respond appropriately to usual work situations and changes in a routine work setting. AR914-15, Ex. 24F/6-7. He

assessed "extreme" limitations when instructions were complex. Id.

Dr. Swenson provided rationale for each assessment consistent with his

reported evaluation. AR914-16, Ex. 24F/5-7.

**E.    Claimant and Lay Witness Statements**

**1.    Valerie Darnell's Testimony**

Ms. Darnell testified before ALJ James Olson on August 22, 2012, about

her symptoms. AR1050. She could not watch TV because

> I don't hear what they're actually saying. I hear other things. I have
> a lot of manic episodes where my mind is racing or I see things out
> of the corner of my eye that aren't there. I'm constantly looking
> over my shoulder. I would like to state that I am drug and alcohol-
> free for 15 months now and the symptoms are still there.

AR1050-51.

> Darnell testified regarding the voices she heard from the television:
>
> They're telling me I'm stupid and I'm fat and I'm useless.
> Sometimes I can't make out what they're saying, but it's like
> they're yelling at me, but I can't understand what they're saying,
> but it's difficult to describe.

AR1052.

> Darnell described her daily activities.
>
> I probably spend a lot of my time in my bedroom with the door
> shut, trying to fight off the voices that I hear, but I do spend time
> with [the family]. They sit on my lap and the kids sit on my lap. I
> do cook dinner. My husband helps me plan and organize that. My
> children help out at times....

AR1053.

Darnell testified that she went through a polysubstance treatment

program in June 2011 and attended AA and NA two to three times a week.

AR1053-54. Darnell testified that she was currently seeing Dr. Hamlyn once a

month and he was working on changing her medications to help stabilize her condition. AR1051, 1054. She testified that when she got out in public away from her family she experienced...

> [p]anic; anything out of the ordinary is panic; anything out of my bedroom is usually panic, even if it's in the living room, but it's getting better, but it's not gone away. Walmart is a challenge. Any time I go anywhere it's a challenge because I just want to be in my comfort area which is in my bedroom.

AR1054.

At her August 12, 2014 hearing before ALJ Hogg (AR985), Darnell testified that she was taking 160 mg. of Geodon (increased from 60 mg. a year ago), 4 mg. of Xanax, and 100 mg. of Pristiq,[26] plus Levothyroxine. AR991. She had side-effects of drowsiness, blurred vision, and slurred speech, and her tongue moved abnormally.

Darnell testified to her current daily activities, consisting of rising between 4:00 and 6:00 a.m., drinking coffee, praying and meditating, and returning to bed for three or four hours. AR992-93. She had five children at home, ages 9, 12, 15, 16, and 19. AR993, 998. When she rose again, she sat in her chair. "I don't watch TV.... I have a hard time focusing on the TV because of the hallucinations and voices that I hear." AR994. The voices were disturbing and "I don't watch TV alone, I'll put it that way." AR994.

---

[26] Pristiq Desvenlafaxine [Pristiq] is a selective serotonin and norepinephrine reuptake inhibitor (SNRI) used to treat depression. Side-effects include extreme tiredness, shaking, and other effects. https://medlineplus.gov/druginfo/meds/a608022.html, accessed March 2, 2018.

How long she sat in her chair depended on her mood. If she was feeling "manicky" she would pace from wall to wall in her bedroom, "I'll just walk back and forth." AR994. "Or sometimes I call my husband to get, you know, direction from him." AR994. Her husband was a roofer and she would call him at work to get some kind of direction how to think and what to do. AR95. "[S]o then ... after I pace for about an hour or so I'll lay back down." Darnell testified that the kids made their own breakfast and lunch. Darnell, with help from her husband, cooked dinner at night. AR995.

Darnell testified, "I go from my chair in the living room to my bed, back and forth all day.... That's my safe zone." AR995.

She tried to go to noon meetings for Narcotics Anonymous three times a week. AR997. That was during school. "[I]t got me out of the house when the kids were gone." In the summer she went less often, once or twice a week. AR996. She described spacing her Xanax to permit driving to NA. AR997. Usually after taking Xanax she lay down. She took Xanax at ten, lay down, then got up to go to her noon meeting when it was partially worn off. AR997.

Other than NA she was not involved in social things. She mainly interacted with her family. AR997. Sometimes in the summer the nine-year old would come inside and sit on her lap. Sometimes the children would turn on the TV and "I instantly go to the bedroom because ... the cartoons really get to me. I can't watch cartoons." AR998.

Her typical days were different during the school year. She and her husband would get up around 7:00, wake the children and get the two younger

children out the door to catch the bus by 7:00. AR998. David helped because he left for work at 8 a.m. She drove the two older kids to high school, then returned home and lay down until 10:00 a.m., got up, took her medicine, and lay down again. AR999.

Sometimes she sat in her chair in the living room during the day and sometimes she stayed in bed. AR1000. If she was manic she paced, if not, she lay down. AR1000. She did not read except for an NA daily reading. AR1000. Once or twice a week she was on the phone. She sometimes but not often looked at her Facebook account on her phone. AR1001.

About 3:30 she picked up the high school children. At 4:30 or 4:45 she started dinner and her husband came in and helped her finish. AR1002.

Her days were "tough" in October 2011 when the family moved to South Dakota and her husband had a job that took him away two nights at a time. AR1002. "The kids would help out a lot and usually I wouldn't cook dinner.... [M]y husband and I would make sure they had something to cook like a TV dinner or Cup O' Noodles or Spaghetti-O's or raviolis or sandwiches." She usually did not cook when David was gone. AR1003.

She had met one neighbor, Bob, "an older gentleman," that she waved at if she saw him in the yard. AR1003. The kids visited him because he gave them cucumbers and tomatoes from his garden. AR1003. She did not go to church. AR1003.

She shopped at Walmart with her husband. He drove. It took an hour and a half. She testified, "Walmart stresses me out." She stayed with her

husband in the store. AR1004. She did not go to the store for bread or milk during the week. She did not do yard work or gardening. AR1005.

Darnell did her and David's laundry and the kids did their own. AR1005. Sometimes she helped her youngest child, who was too short to reach the washer. "She'll carry the dirty laundry downstairs and I'll put it in the washer and then convert it to the dryer ... and then she takes it out of the dryer and takes it up to her room and folds it." AR1006.

The children had chores to do but the house "could be kept up a little more.... [T]here's stuff I could do, but I don't do ... because I'm usually sleeping or pacing." AR1006. She did not have motivation to dust or clean. AR1007.

Hallucinations were daily. "Usually in the morning with the coffee I see bugs around the coffee pot that aren't there, that I have to realize that they're not there. I try to focus in on it to see that they're not there, but I see them at first glance and then I'll look again and they'll be gone.... She saw "flash spots" in her vision once or twice a day. AR1007-08. Auditory hallucinations were worst when she was home alone. "I hear 'mommy.' I hear people calling my name...."

In the summer it was not as bad because the kids were around; in the school year she heard the voices three days a week for about a half-hour. AR1008. Darnell testified that her hallucinations "used to be a lot worse." She said, "I would constantly be looking over my shoulder, seeing things out of the corner of my eye and I would see snakes on the ground and it was ... a lot worse before [her medication increase]. AR1009. She would hear the children

criticizing her. AR1009. "[T]hey would put me down, saying that I was no good and ... they would talk to me and I would hear something different than what they were saying so I'd have to try to read their lips." AR1010. This had not happened since she moved to South Dakota in October 2011. AR1010. The hallucinations improved on Geodon. AR1010. The dose of Geodon had been quadrupled in the last year. AR1011-12.

## 2. David Darnell's Testimony

David Darnell, Valerie Darnell's husband (hereinafter "David") testified on August 22, 2012, before ALJ Olson. He testified that he and Valerie had been married 15 years and that eight or ten years before she became eligible for SSD because of a mental condition. AR1055-56. David testified that her drug and alcohol use had been terrible for the family, that life was really bad for him and the children, they could not count on her, she was always gone, money would be missing, and he would catch her in obvious lies. AR1056.

David testified that since she stopped using alcohol or drugs 15 months ago she could be counted on to be where she said she was going to be. He would drive by the location of NA and AA meetings and she was there. He controlled all of the family finances and Valerie did not have access to the bank account. AR1057-58.

David testified about Valerie's auditory and visual perceptions:

She often complains about seeing things and hearing voices. Whenever we have family movie night she has to usually excuse herself from the room.... [S]he just feels like they're talking to her in the movies and ... we generally just sit in the living room with the TV turned off because it bothers her so bad.... [F]requently

34

she'll say 'what?' ... thinking that I said something ... when I haven't spoken....

Asked how she handled changes of the children's schedules, David testified, "Man, it's a nightmare.... I have to really be involved as far as the reminding her about scheduling and the kids are always reminding her and me, too, because well, you know, I'm busy but – [f]our kids live with us that are still in school so it's a challenge." AR1057.

David testified that Valerie did not get things done and "the house is a mess or we have to go back to the store to get ... things that were forgotten or ... items that we need that weren't gotten and we should know that we need them" or "things that we purchased left at the store or her purse left at the store." AR1058.

## F. Opinion Evidence

Opinions were provided by DDS non-examining psychologists, the treating psychiatrist, and the non-examining medical experts who testified at hearings, covered under that section heading.

### 1. Dr. McGee

J. McGee, Ph.D., completed a PRTF and MFRC on June 29, 2005. AR572-88, Ex. 2F, 3F. This evidence represented the "comparison point" to be used in any subsequent determination of medical improvement to a level permitting sustained work. Cf. AR54.

### 2. Dr. Stacy

On July 27, 2010 Michael Stacy, Ph.D., completed a PRTF AR652-663, Ex. 11F. He identified affective and anxiety-related disorders. AR652-62.

35

Dr. Stacey did not check any of the signs or symptoms of depressive syndrome or manic syndrome. AR654. He noted that Darnell's bipolar disorder was treated and improved and that her panic disorder and generalized anxiety disorder also were treated and improved. AR654-656. He assessed restriction of activities of daily living as "mild"; difficulties maintaining social functioning as "moderate"; difficulties maintaining concentration, persistence, or pace as "mild"; and found "insufficient evidence" to assess repeated episodes of decompensation. AR660.

Dr. Stacy opined that "significant work related improvement has occurred...." AR662. Dr. Stacy completed the mental RFC form. AR664-66, Ex. 12F. He assessed Darnell as not significantly limited in areas of understanding and memory. She was not significantly limited in areas of sustained concentration and persistence except for the ability to carry out detailed instructions, which was moderately limited. AR664-65. She was not significantly limited in social interaction except that the ability to interact appropriately with the general public, and to accept instructions and respond appropriately to criticism from supervisors was moderately limited. AR665. Adaptive abilities were not significantly limited. Id. Dr. Stacy opined that Darnell could understand, remember, and carry out simple to moderately complex instructions; make commensurate work-related decisions; sustain concentration and persist at tasks at that level; relate acceptably to others in a work setting with limited social demand; and adapt to most changes in work routine. AR666.

### 3. Dr. Doxsee

On March 7, 2011, Deborah J. Doxsee, Ph.D., completed a PRTF. AR813-821, Ex. 19F. Dr. Doxsee identified Darnell's mental impairments as bipolar disorder, generalized anxiety disorder, and panic disorder. AR816-17. She concluded that "significant work related improvement" had occurred, AR824, and concluded Darnell experienced mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation of extended duration. AR821.

Dr. Doxsee completed a mental RFC form and opined Darnell was moderately limited in the ability to carry out detailed instructions; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to set realistic goals or make plans independently of others. AR810-811. She opined that Darnell was not significantly limited in any of the other 16 assessed work-related mental abilities. Id. Dr. Doxsee opined that Darnell retained the ability to understand, remember, and carry out simple work instruction; maintain adequate attendance and sustain an ordinary routine without special supervision; interact appropriately with peers and supervisors; and adapt to most usual changes in the work setting. AR812.

### 4. Dr. Hamlyn

On December 14, 2012, Dr. Hamlyn completed a Psychiatric Source Statement. AR905-08. He completed the DSM-IV-TR Multiaxial Evaluation. He stated that Darnell's Axis I diagnosis was "295.70," Schizoaffective disorder [DSM-IV-TR, American Psychiatric Association, 2000, p. 159]. AR905. Dr. Hamlyn opined GAF's fluctuating from 45 to 74 in the course of his treatment with a current GAF of 45. Id.

Dr. Hamlyn identified signs and symptoms of her mental impairment: perceptual disturbances, sleep disturbance, irritability, hypomanic episodes, social withdrawal or isolation, emotional lability, recurrent panic attacks, generalized persistent anxiety, and difficulty thinking or concentrating. AR905. He described the patient's response to treatment: "Fluctuating levels of symptoms, have used different antipsychotic meds. The regimen not yet stabilized." AR906. The patient's prescribed medications at this time were Geodon 160 mg, Pristique 50 mg, and Latuda[27] 40 mg. Id.

The form asked Dr. Hamlyn to assess activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation applying the concept of standard deviations, with "marked" meaning 2 standard deviations below the mean. Dr. Hamlyn assessed

---

[27] Latuda (Lurasidone) is a newer atypical antipsychotic for schizophrenia. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3171824/, accessed March 2, 2018. Side-effects include drowsiness and other effects. http://www.drugs.com/sfx/latuda-side-effects.html. Accessed March 2, 2018.

restrictions as: "Moderate," "Moderate," Frequent," and "3 or more" decompensations in a year. AR906.

Dr. Hamlyn assessed "medically documented history of a chronic mental disorder of at least 2 years' duration causing more than minimal limitation of ability to do basic work activities with symptoms or signs currently attenuated by medication or psychosocial support." AR906. His patient had repeated episodes of decompensation, each of extended duration. Id. She had a residual disease process resulting in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause her to decompensate. AR906-07. She had a current history of inability to function outside a highly supportive living arrangement. AR907.

Dr. Hamlyn opined, retrospectively that since September 1, 2010, she would have been absent from work more than three times a month. AR907.

Dr. Hamlyn assessed "fair" (defined as substantial loss of ability to perform the activity in competitive work, able to function where accommodations are provided) ability to understand, carry out and remember simple instructions on a sustained basis. AR907.

Dr. Hamlyn assessed Darnell's ability to respond appropriately to supervision, coworkers and usual work situations on a sustained basis, as "None." She had "poor" (defined as ability to perform the activity in a sheltered work setting) ability to deal with changes in a routine work setting on a sustained basis. AR907. He explained: Sometimes the patient had mistaken instructions for her medication. The patient could not tolerate being in public

39

or interacting in social settings due to chronic psychotic symptoms. She had difficulty tolerating changes due to frequent psychotic symptoms. Id.

Dr. Hamlyn's opinion was based on information in his records, clinical observations, his knowledge of the diseases and disorders presented and their nature and course, and the reasoned medical relationships among these factors. AR908. Dr. Hamlyn stated his qualifications: board-certified psychiatrist in practice for 23 years. (Id.)

### 5. Dr. Bentham

On August 11, 2014, Jack Bentham, Ph.D., the ALJ's non-examining medical expert, completed a mental RFC form. AR959-61, Ex. 29F. He opined "marked" restrictions of ability to understand and remember simple instructions, make judgments on simple work-related decisions. AR959. Dr. Bentham stated reasons: "Depressed, limited skills - cannot perform complex work[,] withdrawal, energy limited, lacks judgment[,] limited follow through on simple and complex tasks[,] memory loss". AR959, Ex. 29F/1.

Dr. Bentham assessed "marked" limitations of ability to respond appropriately to usual work situations and to changes in a routine work setting. AR960, Ex. 29/2.

He stated reasons: "limited skills to interact with the public, supervisors & coworkers. Limited ability to respond to changes in the work setting. Stress will be incumbent on her ability to work". AR960, Ex. 29/2. He said other capabilities were affected by her impairment: "She experiences significant mood fluctuations[;] History of visual hallucinations[;] Concentration, persistence &

pace." He identified factors supporting this assessment: "Bi-Polar, depressed with psychotic features 296.59[;] Anhedonia, sleep disturbance, loss of energy, social withdrawal, hallucination". AR960, Ex. 29/2. Asked to state an opinion as to what date these limitations were first present, Dr. Bentham opined "Dec, 2011." He noted remission from polysubstance abuse and alcohol dependence since June 1, 2011. AR960, Ex. 29/2. He opined that Darnell could manage benefits in her own best interest. AR961, Ex. 29/2. Dr. Bentham offered additional opinions at the August 22, 2014 hearing. AR985.

## G.     The Hearings

### 1.     The First Hearing

Robert Pelc, Ph.D., a licensed psychologist, testified as a nonexamining medical expert at Darnell's August 2012 hearing. AR1044. He testified that the record indicated Darnell had three psychological impairments: bipolar disorder, an anxiety disorder--either panic disorder or generalized anxiety disorder, and polysubstance abuse. AR1045-46.

Dr. Pelc testified that the record indicated Darnell's psychological functioning was more significantly compromised back in 2004 and 2005, but that she had "achieved some reasonable stability" more recently. AR1046. He opined that Darnell could understand, remember, and carry out "at least two and three-step operations" that were simple and repetitive, and interact with the public, coworkers, and supervisors occasionally to frequently, meaning from one-third to two-thirds of the time. AR1048-49.

## 2. The Second Hearing

Jack Bentham, Ph.D., a board-certified clinical psychologist, was the non-examining medical expert who testified at Darnell's August 2014 remand hearing before ALJ Hogg. AR1013. He was on the telephone during her testimony at the hearing. AR990. He reviewed the medical exhibits through 27F. AR1013.

Dr. Bentham testified that the claimant's mental impairment was "bipolar I disorder" and she also had amphetamine [abuse] in remission on June 1, 2011. AR1014.

Dr. Bentham, considering whether Darnell's mental impairment met or equaled a listing, stated that the records were unremarkable on March 7, 2011 "where there was a psychiatric review and then a work-related activity follow-up... But when you start looking down at the records into 12/14/2012, you have a psychiatric source statement by Dr. Hamlyn who is the treating source and ... he believes that the person had a worsening of her conditions beginning on 10/25/2011. And in there he talks about perceptual disturbances and sleep disturbance, irritability ..., hypomanic episodes, social withdrawal and isolation, emotional lability, recurrent panic attacks, persistent anxiety and difficulty in thinking and concentrating." AR1014. Dr. Bentham stated that he was referring to Exhibit 23F. AR1015.

He then reviewed Exhibit 24F, Dr. Swenson's examination reported a diagnosis of "bipolar I, the most recent episode depressed" and "psychiatric features which we've been hearing today in the form of those hallucinations."

AR1015. Dr. Bentham testified, regarding Dr. Swenson's assessment of work-related activities, "he actually has them probably worse than I would have." Dr. Bentham opined "marked" impairment of ability to understand and remember simple instructions and ability to make judgments on simple work-related decisions. AR1015.

Dr. Bentham opined that Dr. Hamlyn's clinical findings supported his conclusions, as did Dr. Swenson's clinical findings. AR1016-17.

The ALJ told Dr. Bentham to focus on the period from September 1, 2010 to October 25, 2011. AR1017. The ALJ asked Dr. Bentham whether he agreed with Dr. Hamlyn's opinion that Darnell's condition had persisted with the restrictions he outlined, since September 1, 2010. AR1017.

Dr. Bentham stated that he was not able to assess the evidence and clinical evidence for the period from September 1, 2010 to October 24, 2011, and could only document it until October 25, 2011. AR1017.

The ALJ asked, "[S]ince October 25, 2011, does the evidence establish the claimant either meeting or equaling any mental listing?" AR1017. Dr. Bentham opined that Darnell's mental impairment which he described as bipolar I disorder, most recent episode depressed, moderate, with mood incongruent psychotic features was listing-level. AR1018.

The ALJ stated, "I assume she wouldn't meet the C listing, would she? Dr. Bentham: "No, sir." AR1019.

The ALJ stated, "As I understand it, you would assess the meeting of the listing by – as of October 25, 2011 or some other time?" Dr. Bentham: "No, October 25, 2011." AR1019.

The ALJ stated, "Now before October 25, 2011, when she didn't meet the listings, how would you have assessed her, you know, from ... September 10 to October 25, 2011, what would be the limitation? I assume the diagnosis is still the bipolar disorder with .... AR1020.

Dr. Bentham stated that all of the "B" criteria would be moderately limited AR1020. The ALJ asked if during the period of narcotic use she met Listing 12.09, "is that true?" Dr. Bentham stated, "obviously, I think she would meet the listing [12.09]." AR1021. The ALJ stated, "That wouldn't ... materially affect [ADLs, social functioning, and concentration], is that true?" Dr. Bentham: No.

The ALJ stated, "going back ... to September 1, 2010, that happens to be the date the Social Security Administration had indicated that she had medical improvement, so how would you have rated her on the mental residual functional capacity before October 25, 2011? If you would address that. I kind of assume it would be in the moderate level in many of them, but would you address that?" AR1022.

Dr. Bentham stated that there would be moderate impairment of ADLs and social functioning, and "persistence of pace, mild." AR1023. Dr. Bentham stated, "She's never had a problem with [interacting with others], and that "at

that time," she had moderate limitations responding to usual work situations and changes in a work routine setting. AR1022.

The ALJ turned the witness over to counsel, who asked if he had noted the record evidence "that she had these symptoms, including auditory and visual hallucinations really since childhood?" Dr. Bentham said, "I did see that but if you look at the Rapid City Regional Hospital Behavioral Health report and they talk about bipolar which is what we're talking about, and they talk about most recent episodes ... and they claim that it's in remission, 6/13/12, 4/11/12 to 8/12 and then depressed with psychotic episodes improving and depressive in remission as of 11/16/11. So they're raising issues here, but I'm still willing to stay with the 10/25/11, but I can't go back any further." AR1023.

Counsel asked Dr. Bentham if he knew that he was permitted to make a retrospective assessment. AR1024. He said he did. Counsel then asked, with interruptions from the ALJ, if, "knowing what you know about this claimant and focusing on the period from ... September 2010 until October 2011, do you think that – do you have any opinion about her ability to sustain full-time employment?" AR1024. Dr. Bentham said he could "only go by the 18F, 19F and –" Counsel interrupted: "I want you to go by what you know." The ALJ interrupted, "Well, he's referring ... to 18F and 19F," and Dr. Bentham stated, "Ma'am, I can only respond according to what the medical records tell me."

Counsel stated, "I'm asking you to respond based on your experience, knowledge, training and skill." AR1025. Dr. Bentham stated, "I can't respond

45

when I have medical records that are inconsistent with what your question is."
AR1025. Counsel asked if he was referring to Exhibit 21F/30 where
Dr. Hamlyn recorded, "She states 'she's been feeling good, not having severe
anxiety or depression or anger or hallucinations....'" Okay. So she was better
then, on that particular visit, but you see 21F/7, two months later, August 20,
2012, he said, 'she's been feeling anxious and having auditory hallucinations
... and the Risperdal wasn't strong enough to control the voices.' So would you
agree that she had some decompensation from June 2012?" Dr. Bentham said,
"We're talking about ... 1/25/11." Counsel: ""[B]ut you were ... sort of relying
on the fact that she was better in June 2012...." Dr. Bentham: "I'm not saying
that, ma'am, and what I'm stating is that 18F and 19F stated that she was
better, which are 3/6/2011." Counsel asked if Dr. Bentham agreed that these
two exhibits were the DDS RFCs, which were non-examining, "based on the
medical records available to them at that time."

Dr. Bentham stated that the medical report Ex. 15F/11 indicated, "there
are times when there is some improvement and then she decompensates."
AR1030. Counsel asked, "Do you think it's even possible that her vacillating
bipolar disorder could have gone into remission between September 10, 2010
and October ... 25, 2011?" The ALJ interjected, "That seems like asking for a
speculative answer." Counsel: "I'm asking for his opinion, if he's able to give it,
based on his knowledge and experience, training and skill with this particular
disorder...." AR1032. Dr. Bentham stated, "I'm looking on page ... 27 or 35 on
the Rapid City Regional Hospital and ... past medical history, most recent

episodes of bipolar in remission, 6/3/12, 4/11/12, 2/8/12; depressed with psychotic features improving 1/12/12, 12/16/11; depressed in partial remission, 11/16/11; currently depressed with psychotic features, 10/25/11 which is what I've been using as the date." AR1031. Counsel had no further questions.

At the close of the hearing the ALJ said, "I'm not saying that I'm prepared, at this time, to go with October 25, 2011, but, frankly, I think the medical expert's testimony is pretty persuasive...." AR1039.

## H.   Issues Before this Court

On appeal, Ms. Darnell raises three issues:

1.   Did the ALJ[28] rebut the presumption of disability given the nature of Ms. Darnell's mental impairments?

2.   Are the opinions of Dr. Pelc and Dr. Bentham substantial evidence in support of the ALJ's decision?

3.   Can the ALJ's decision be reconciled with Dr. Hamlyn's opinion to which the ALJ gave "great weight"?

The Commissioner argues in favor of affirming the ALJ's decision below.

## DISCUSSION

## A.   Standard of Review.

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); <u>Minor v. Astrue</u>, 574 F.3d 625, 627

---

[28] From this point forward in this opinion, all references to "the ALJ" are to ALJ Hogg and his opinion following the second ALJ hearing.

(8th Cir. 2009).  Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975).  "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action."  Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (internal punctuation altered, citations omitted).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it.  Minor, 574 F.3d at 627.  The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision.  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Woolf v. Shalala 3 F.3d 1210, 1213 (8th Cir. 1993).  If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed.  Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993).  "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record."  Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed.  Smith v. Sullivan, 982 F.2d 308, 311

(8th Cir. 1992); 42 U.S.C. § 405(g).  Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed.  Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998) (citations omitted).  The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court.  Smith, 982 F.2d at 311.  Where "[s]everal errors and uncertainties in the opinion [occur], that individually might not warrant remand, in combination create sufficient doubt about the ALJ's rationale for denying" benefits, remand for further proceedings before the agency is warranted.  Willcockson v. Astrue, 540 F.3d 878, 880 (8th Cir. 2008).

**B.      The Disability Determination and the Eight-Step Procedure.**

Normally, upon a claimant's initial application for disability benefits, the Commissioner must apply a five-step procedure to determine disability. However, when a claimant has already been found to be disabled and awarded benefits, the Commissioner has outlined eight steps to guide the ALJ's consideration:

> Step One:   Is the claimant engaging in substantial gainful activity?  If so, and any trial period of work has been completed, the claimant is no longer disabled.  20 C.F.R. § 404.1594(f)(1).
>
> Step Two:  Does the claimant have an impairment or combination of impairments which meet or medically equals the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, Appdx. 1.  If so, the claimant's disability continues. 20 C.F.R. § 404.1594(f)(2).
>
> Step Three: Has there been a medical improvement in the claimant's condition since the time disability benefits were awarded?  Medical improvement is any decrease in medical severity of the impairment(s) as established by improvement in symptoms, signs and/or laboratory findings.  If medical

improvement has occurred, analysis proceeds to step four. If not, analysis proceeds to step five. 20 C.F.R. § 404.1594(f)(3).

Step Four: Is the medical improvement related to the claimant's ability to work? Medical improvement is related to the claimant's ability to work if it results in an increase in the claimant's capacity to perform basic work activities. If so, analysis proceeds to step six. 20 C.F.R. § 404.1594(f)(4).

Step Five: Is there an exception that applies to medical improvement? There are two categories of exceptions set forth at 20 C.F.R. § 404.1594(d) and (e). If one of the first group of exceptions applies, the analysis proceeds to step six. If one of the second group of exceptions applies, the claimant's disability ends. If no exceptions from either group applies, the claimant's disability continues. 20 C.F.R. § 404.1594(f)(5).

Step Six: Are the claimant's current impairments in combination severe? If not, then the claimant is no longer disabled. If so, analysis proceeds to step seven. 20 C.F.R. § 404.1594(f)(6).

Step Seven: The ALJ must assess the claimant's residual functional capacity (RFC) based on current impairments and determine if she can perform past relevant work. If so, her disability has ended. If she cannot perform past work, proceed to step eight. 20 C.F.R. § 404.1594(f)(7).

Step Eight: Given the claimant's RFC, are there other jobs the claimant can perform, considering her age education, and past work experience and do significant numbers of those jobs exist in the claimant's region or in several regions of the country? If so, the claimant's disability ends. If not, the claimant's disability continues. 20 C.F.R. § 404.1594(f)(8).

## C. Burden of Proof.

### 1. Burdens Under the Eight-Step Procedure

The plaintiff bears the burden of proof at steps one through seven of the eight-step inquiry. The burden of production only shifts to the Commissioner at step eight to show evidence that demonstrates other work exists in significant numbers in the national economy that the claimant can do. See

Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir. 1991) (*per curiam*).

Cf. Mittlestedt, 204 F.3d at 852; Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994). 20 C.F.R. § 404.1512(a) (discussing burden shifting in the five-step analysis). "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner." Stormo v. Barnhart 377 F.3d 801, 806 (8th Cir. 2004).

## 2.	Presumption When Commissioner Seeks to Terminate Benefits

Specifically as to cases involving termination of disability benefits when a claimant has previously been found to be disabled, Ms. Darnell asserts there is a presumption of disability that the Commissioner has the burden to overcome. She cites Rush v. Sec'y. Health & Human Servs., 738 F.2d 909 (8th Cir. 1984), for the proposition that such a presumption exists. The Rush court did hold "there is a presumption that a claimant who has previously been determined to be disabled remains disabled." Id. at 915. The Rush court placed the burden on the Commissioner to "come forward with evidence which indicates that there is a legitimate reason to reevaluate the claimant's right to receive benefits and which, if believed, would justify termination" of disability benefits. Id. at

51

915-16.  At the time the court decided <u>Rush</u>, there were no legislative statutes addressing the procedures and burdens of proof for termination; only regulations promulgated by the Commissioner addressed the issue.  <u>Id.</u> at 913.

The holding in <u>Rush</u> was short-lived.  The <u>Rush</u> decision was issued on June 27, 1984.  On September 19, 1984, Congress passed the Social Security Disability Benefits Reform Act of 1984, which President Ronald Reagan signed into law on October 9, 1984.  <u>See</u> Pub. L. No. 98-460, 98 Stat. 1794 (1984).

Among other things, the 1984 legislation set standards for reviewing disability benefit terminations.  <u>Id.</u>, codified at 42 U.S.C. 423(f).  Congress specifically provided *no presumption* should apply:  the determination as to the continuing existence of a disability is to be made on a "neutral basis" and "without any initial inference as to the presence or absence of a disability being drawn from the fact that the individual has previously been determined to be disabled."  <u>See</u> 42 U.S.C. § 423(f).  The Eighth Circuit promptly recognized that its holding in <u>Rush</u> as to the presumption "no longer stands."  <u>Polaski v. Heckler</u>, 751 F.2d 943, 946 (8th Cir. 1984), <u>overruled on other grounds</u>, <u>Bowen v. Polaski</u>, 476 U.S. 1167 (1986).  <u>See also</u> <u>Nelson</u>, 946 F.2d at 1315 (in a disability termination proceeding "no inference is to be drawn from the fact that the individual has previously been granted benefits.  42 U.S.C. § 423(f).").  Hence, the court rejects Ms. Darnell's invitation to hold that the Commissioner must rebut any presumption of disability.

### 3. Substance Abuse Issues

If the claimant is found to be disabled and there is medical evidence of substance abuse disorders, the Commissioner must determine if substance abuse contributes materially to the determination of disability. 20 C.F.R. § 404.1535. The Commissioner must consider what physical and mental limitations would still remain even if the claimant stopped abusing substances. If the remaining limitations would not be disabling, then the substance abuse disorder is considered a material contributing factor and the claimant is deemed not disabled. Id. Here, the medical evidence established that Ms. Darnell's substance abuse did not contribute materially to her disability. AR1020-21.

## D. Was the ALJ's Decision Supported by Substantial Evidence Given the Nature of Ms. Darnell's Mental Impairments?

Ms. Darnell argues the ALJ failed to rebut the presumption of continuing disability because he failed to consider criteria that apply when a mental disorder is characterized by "remissions and prospects for future worsening." As discussed immediately above, this court does not apply a presumption of disability. Therefore, Ms. Darnell's argument is reduced to this: both the experts and the ALJ failed to consider the longitudinal evidence of Ms. Darnell's mental impairments as required by 20 C.F.R. § 404.1579(c)(4). Ms. Darnell asserts the record establishes that when she first received benefits, it was recognized that she had a mental disorder that waxed and waned— "characterized by remissions and prospects for future worsening." Her

symptoms fluctuated frequently and her illness was described as a "rapidly-cycling" pattern.

The Commissioner argues the ALJ's decision is supported by substantial evidence in the record. She points to records from Dr. Hasan from March and August 2010; and from Dr. Everson in May, 2010. The Commissioner argues these records show marked improvement and stability in Ms. Darnell's condition. JS36, 37, & 40. The Commissioner asserts the ALJ did not rely solely on non-examining psychologists who testified at the two ALJ hearings. The ALJ relied on these treating medical sources' notes (Drs. Everson and Hasan) and also Ms. Darnell's statements to her medical sources in those notes.

In addition to Ms. Darnell's treating physicians, the Commissioner argues the ALJ *may* rely on non-examining state agency medical consultants and the testifying medical experts. The Commissioner cites <u>Ponder v. Colvin</u>, 770 F.3d 1190, 1194-96 (8th Cir. 2014); <u>Smith v. Colvin</u>, 756 F.3d 621, 627 (8th Cir. 2014); and <u>Casey v. Astrue</u>, 503 F.3d 687, 693 (8th Cir. 2007). The following opinions from state agency medical consultants also support the ALJ's decision according to the Commissioner: (1) Dr. Stacy's July, 2010, opinion (AR664-66); (2) Dr. Doxsee's March, 2011, opinion (AR810-24); (3) Dr. Pelc's August, 2012, opinion (JS129); and (4) Dr. Bentham's August, 2014, opinion (JS132, 137, 141).

The cases cited by the Commissioner are inapposite here because in each of those cases, there was a conflict between a treating physician's opinion and

that of a nontreating consultant and the ALJ gave more weight to the

nontreating consultant's opinion because it was either more consistent with

the record, was better supported, or because the treating physician's opinion

was internally inconsistent with his own records.  Ponder, 770 F.3d at

1194-96; Smith, 756 F.3d at 627; and Casey, 503 F.3d 693.  In each of those

cases, the ALJ recognized the conflict between the treating and nontreating

physicians' opinions and resolved the conflict in favor of the nontreating

physicians' opinions.  Id.  Here, the ALJ did not.  He never acknowledged the

conflict in the opinions of Dr. Hamlyn and the nontreating sources as to

Ms. Darnell's disability for the period from September 1, 2010, to October 24,

2011.  Since the conflict was never acknowledged, the ALJ never resolved the

conflict.  Instead, the ALJ gave "great weight" to all the opinions.  AR35-37, 43,

46-47.

In reply to the Commissioner's arguments, Ms. Darnell argues that

Dr. Everson saw Ms. Darnell one time.  She argues opinions from such sources

are not substantial evidence, citing Leckenby v. Astrue, 487 F.3d 626, 635 (8th

Cir. 2007) (holding *consulting* physician who saw claimant once was not

substantial evidence); and Vincent v. Apfel, 264 F.3d 767, 769-70 (8th Cir.

2001) (same).  Furthermore, she points to records from January and February,

2011, showing Ms. Darnell's symptoms were severe and that she had GAFs of

between 35-45—JSMF42, 44.  Ms. Darnell points out that she was

psychiatrically hospitalized in June, 2011.  JSMF52.  Finally, in July, 2011,

the dosages of 3 already-potent antipsychotic medications were increased—

JS55.  Ms. Darnell reiterates her assertion that the ALJ failed to consider the nature of the illness in that it was characterized by remissions and worsenings.

### 1.    Summary of the Medical Evidence

Because Ms. Darnell urges a longitudinal view of the evidence, the court summarizes the medical records, with a special emphasis on the period in question in this appeal—September 1, 2010, to October 24, 2011.

The record shows Ms. Darnell complained of hallucinations, both auditory and visual, since at least October 1, 2004.  AR590.  She was diagnosed with bipolar disorder at least as early as February 10, 2005.  AR599.  She has been taking psychiatric medication at least since 2004.  AR599.  In her initial application for disability benefits, the consulting examining expert diagnosed Ms. Darnell on June 15, 2005, with bipolar I with psychotic features and panic disorder with agoraphobia.  AR606.  Ms. Darnell's documented medications as of June, 2005, were Ambien, Oxazepam, Zyprexa, Effexor XR, Lamictal and Buspar.  AR604.  Ms. Darnell was found to be disabled as of July 21, 2005, on the basis of her mental impairments.  AR53-54.

From January 20, 2009, until September 6, 2011, Ms. Darnell saw Dr. Syed Hasan.  AR610-33.  On March 3, 2010, Ms. Darnell reported to Dr. Hasan her depression and anxiety were markedly improved.  AR613.

Ms. Darnell saw Dr. Michael Everson once, on May 5, 2010, and he diagnosed her with bipolar mood disorder, panic disorder, and generalized anxiety disorder.  AR634-38.  Dr. Everson prescribed Xanax 1 mg., Lamictal

200 mg., Seroquel 300 mg., Neurontin 300 mg., and Abilify.  Id.  Dr. Everson assessed Ms. Darnell's GAF at 70.  Id.

On May 8, 2010, Dr. Hasan noted Ms. Darnell seemed more sleepy. AR645.  In August, 2010, Ms. Darnell reported to Dr. Hasan that her depression and anxiety had markedly improved and her depression was stable. AR673.  On November 15, 2010, Ms. Darnell told Dr. Hasan she was feeling better, her mood was stable and she denied any suicidal ideation.  AR671. However, she also said she "gets pretty tired, weak and more suicidal."  Id. This latter comment was made in connection with an attempt Ms. Darnell had made to assist her sister-in-law for a few hours.  Id. Dr. Hasan noted Ms. Darnell cannot work even for a few hours, noting that she had tried to assist the sister-in-law unsuccessfully.  Id.

In January, 2011, Ms. Darnell saw a therapist, Sherrie Brodie, after having been convicted of felony assault on her husband, David Darnell. AR798-800.  The date of the assault is not mentioned.  AR799.  Ms. Darnell reported she was "sad, tired, tearful, worthless, hopeless, loss of interest, withdrew from others, had difficulty concentrating and making decisions, confused, had racing thoughts, recurring worry, anxiety and irritability." AR798.  Ms. Brodie assessed a GAF of 35.  AR800.

On February 9, 2011, Ms. Darnell saw Dr. Hasan and reported being more depressed, saying she was separated from her husband.  AR966.  On February 13, 2011, Ms. Darnell saw the therapist Ms. Brodie, again, who noted severe depressive symptoms.  AR800, 803.  On February 16, 2011, Dr. Hasan

57

saw Ms. Darnell, who reported doing better with her depression and anxiety, however, experiencing occasional weakness, tiredness, fatigue and dysuria.[29] AR969.

Dr. Hasan saw Ms. Darnell again March 10, 2011, and noted her mood was "pretty stable at this time." AR967. On April 14, 2011, Dr. Hasan noted Ms. Darnell complained of weakness, tiredness, and fatigue. AR965.

From June 2 to 9, 2011, Ms. Darnell was voluntarily admitted to a psychiatric hospital in Kansas City, Missouri, complaining of bipolar, using methamphetamine, having mood swings, being paranoid, and having auditory and visual hallucinations.[30] AR972. At the time she was taking the following psychiatric medications: Lithium, Xanax, Seroquel, Lamictal, and Effexor. Id. Upon her discharge from the hospital, the attending Dr. Mirza discontinued her Lithium and Risperdal medications. Id. He increased her Seroquel dosage, introduced Depakote 750 mg. to her medicine regimen, reduced her Xanax, and halved her Effexor dosage. Id. This hospitalization marked the beginning of Ms. Darnell's sobriety from alcohol and drugs. AR37.

Dr. Mirza saw Ms. Darnell post-discharge on July 2, 2011. AR983. He increased her Geodon prescription and added Effexor and Remeron. Id.

---

[29] Painful or difficult urination.

[30] Ms. Darnell's counsel submitted the records associated with this June, 2011, hospitalization after the second ALJ had issued his decision but before the Appeals Council had denied review. AR9, 12-20. The Appeals Council considered the evidence. AR5, 9.

Ms. Darnell was still complaining of some hallucinations.  Id.  Dr. Mirza
assessed bipolar psychosis.  Id.

On August 22, 2011, Dr. Hasan saw Ms. Darnell and noted her mood
was pretty stable.  AR963.  On September 6, 2011, Ms. Darnell saw Dr. Hasan
for the last time before moving to Rapid City, South Dakota—she was seeing
Dr. Hasan for shoulder pain.  AR962.

On October 25, 2011, after arriving in Rapid City, Ms. Darnell saw
Dr. Hamlyn for the first time.  AR856-59.  She was still experiencing
hallucinations, despite her medications of Remeron, Effexor, and Geodon.  Id.
Dr. Hamlyn diagnosed bipolar, depressed in partial remission with psychotic
features.  Id.  He assessed her GAF as 60.  AR858-59.  Dr. Hamlyn decided to
increase Ms. Darnell's dosage of Geodon to 160 mg., to increase her Remeron
to 30 mg., and to keep her Effexor at 30 mg.

One month later, in November, 2011, Dr. Hamlyn prescribed Wellbutrin,
noting that Ms. Darnell continued to have hallucinations.  AR860.  Ten months
later, Dr. Hamlyn changed Ms. Darnell's diagnosis from bipolar to
schizoaffective disorder.  AR849.

The above records can be fairly summarized as showing Ms. Darnell was
doing relatively well from March 3, 2010, until November, 2010, but there were
indications of deterioration.  In January through mid-February, 2011, she was
doing pretty badly.  She had an upswing in mood and stability in mid-February
through April, 2011.  She was very symptomatic in June and July, 2011.  In
August, 2011, she was pretty stable.  In October, 2011, she was again doing

poorly. There is no period where she was consistently doing well for an extended period of time if the medical records are taken at face value. In addition, all during the above dates Ms. Darnell was taking a very hefty regimen of psychiatric drugs, many of which were changed or the dosages increased during this period.

### 2. Summary of the ALJ's Treatment of the Medical Evidence

In descending order of weight, here is the weight the ALJ stated he gave to various medical opinions. The ALJ gave unqualified "great weight" to the opinion of Ms. Darnell's treating psychiatrist, Dr. Hamlyn. AR46. The ALJ accorded "great weight" to Dr. Bentham's nontreating nonexamining opinion because it was supported by medical and other evidence and was consistent with Dr. Pelc's opinion. AR47. The ALJ accorded "great weight" to Dr. Doxsee's nontreating nonexamining opinion because it was supported by Dr. Hasan, Dr. Everson, and David Darnell's testimony and because her opinion was consistent with the opinions of Doctors Bentham and Pelc. AR43. The ALJ gave "great weight" to the opinion of nontreating nonexamining consultant Dr. Pelc as to Ms. Darnell's condition prior to October 25, 2011. AR36-37.

The ALJ accorded "considerable weight" to the opinion of consultative psychiatric examiner, Dr. Greg Swenson, because his opinion was consistent with Dr. Hamlyn's opinion. AR47. The ALJ gave "little weight" to the opinion of Dr. Everson because it was unsupported by specific objective medical signs and findings. AR41. The ALJ did not say what weight he gave to the therapist

60

Sherrie Brodie's opinion, other than to note the GAF of 35 the therapist assessed in January, 2011, was rejected outright; the ALJ noted the therapist was not an accepted medical source, but also noted that the symptoms she recorded were not inconsistent with the mental RFC formulated by the ALJ. AR42.

### 3. Analysis of the ALJ's Treatment of Medical Evidence

As to the period from September 1, 2010, to October 24, 2011, it is hard to reconcile the opinions of each of the medical sources to whom the ALJ said he accorded "great weight." For example, one of the key reasons Drs. Hamlyn and Swenson diagnosed Ms. Darnell to have been so severely impaired post-October 25, 2011, was because she continued to suffer both auditory and visual hallucinations despite consistently taking a wide range of many different psychiatric medications at significant doses. AR856, 913. Yet this fact continued the same for Ms. Darnell throughout her medical records, both before October 25, 2011, and after.

Back in 2004 and 2005 when she initially applied for disability benefits, she was both experiencing hallucinations *and* taking psychiatric medications. See AR590, 599, 606. Similarly, for the period from 2009 through 2014, Ms. Darnell continued taking psychiatric medications. AR610-33, 857, 859, 860, 972, 983, 1011-12. Despite these medications, she reported continuing to experience hallucinations, even at times when her mood was relatively stable. AR635 (May, 2010); AR972 (June, 2011); AR856, 858 (Oct. 25, 2011); AR860

(Nov., 2011); AR1009-10 (Aug. 12, 2014); AR911 (current meds reduce, but do not eliminate visual hallucinations and mood fluctuations).

There are times when Ms. Darnell's medical records reflect no reports of hallucinations; however, the majority of these medical records reflect Ms. Darnell was seeing the doctor for tick bites, boils, rashes, urinary tract infections, vaginal discharge, a cough and diarrhea, chest pains, or a painful shoulder, not specifically for psychiatric care.  See, e.g. AR616, 621-24, 626, 628, 630, 644, 962-63, 967.  More importantly, however, the medical records do not show Ms. Darnell has ever been consistently free from her psychotic symptoms.  The most that can be said is she had a relatively stable period from March through the end of 2010, and another relatively good period from mid-February through May, 2011.  The Eighth Circuit has awarded benefits outright where a claimant has been prescribed increasing dosages of psychiatric medications and continued to suffer mental impairments. Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) (reversing for an award of benefits where claimant's original psychiatric medicine for PTSD and depression was doubled, tripled, and finally increased again a fourth time, but did not eliminate his symptoms); Hutsell v. Massanari, 259 F.3d 707, 711-14 (8th Cir. 2001) (reversing for an award of benefits where claimant had been treated for many years for her psychotic mental illness and had taken psychiatric medications for years which helped, but did not eliminate, her symptoms).

The Commissioner has said the following about illnesses that wax and wane in the termination-of-benefits process:

> (iv) *Impairment subject to temporary remission.*  In some cases the evidence shows that an individual's impairments are subject to temporary remission.  In assessing whether medical improvement has occurred in persons with this type of impairment, we will be careful to consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsenings.  Improvement in such impairments that is only temporary will not warrant a finding of medical improvement.

See 20 C.F.R. § 404.1594(c)(3)(iv).  Although Ms. Darnell does not discuss the concept of "temporary remissions" in her brief before this court, her constant refrain regarding "prior remission[s] and prospects for future worsenings" and her emphasis on the longitudinal medical record is drawn directly from § 404.1594(c)(3)(iv).

The Commissioner does not define "temporary" in its regulation, but does provide further guidance in its Program Operations Manual System (POMS). [31] The Commissioner states "[s]ome impairments are subject to temporary remissions, which can give the appearance of medical improvement (MI) when in fact there has been none.  These types of impairments can appear to be in

_____

[31] The POMS is not binding on either this court or on the SSA.  Schweiker v. Hansen, 450 U.S. 785, 789 (1981).  But, as with any agency, the agency's own interpretation of the statute it implements and its own regulations has some persuasive authority.  Draper v. Colvin, 779 F.3d 556, 560-61 (8th Cir. 2015) (according deference to the SSA's interpretation of statute due to thoroughness of agency's consideration, validity of its reasoning, consistency, formality, and expertise).  The Social Security Act is "among the most intricate ever drafted by Congress."  Schweiker v. Gray Panthers, 453 U.S. 34, 43 (1981).  Therefore, even though the POMS does not have the binding effect of law, it is nevertheless persuasive.  Draper, 779 F.3d at 561 (citing Davis v. Sec'y of Health & Human Servs., 867 F.2d 336, 340 (6th Cir. 1989)).

remission when, in fact, the impairments are only stabilized." POMS DI 28010.115A.  In considering whether a temporary remission or medical improvement has occurred, the Commissioner directs ALJs to consider the longitudinal history of the impairment, all the available evidence, and the medical literature about the disease.  Id. at B1b.  The Commissioner lists several impairments which are especially subject to temporary remission; mental impairments are among those listed.  Id. at B2. As to the question "how long is temporary," the Commissioner states "temporary" must be viewed in the light of the longitudinal history of the impairment and the period of remission must have been long enough to have a significant impact on the individual's ability to work.  Id. at B3.

Ms. Darnell's case is not unlike Dreste v. Heckler, 741 F.2d 224 (8th Cir. 1984) (per curiam).  In that case, the court described a five-year history of psychotic illness that included psychiatric hospitalizations, periods of remission, episodes of delusions, and physical abuse toward others.  Id. at 225. Dreste applied for disability benefits in year four of his five-year medical history, and was denied benefits because the ALJ found when Dreste was taking medication, he was stable and there had never been a continuous 12-month period where he was unstable the entire time.  Id. at 225-26.  The court reversed and remanded, rejecting the ALJ's notion that periods of remission were tantamount to periods of nondisability.  Id. at 226.  The court noted that the inherent nature of "psychotic illnesses [is] that periods of remission will occur.  This does not, however, lead to the conclusion that the disability has

ceased, particularly given the overwhelming evidence to the contrary in this case." Id. at 226, 226 n.2.

Similarly, in Vincent v. Apfel, the court reversed and remanded where the ALJ's mental RFC imposing no mental limitations was at odds with Vincent's "extensive treatment records" showing he regularly hallucinated, isolated himself, and would be in treatment indefinitely. Vincent, 264 F.3d at 769-70.

In Carlson v. Shalala, 841 F. Supp. 1031, 1037 (D. Nev. 1993), the claimant suffered from schizophrenia and had a period of remission from 1983 to 1986 where, though constantly and heavily medicated for his mental impairment, he experienced a decrease in symptoms such as hallucinations. The state of the administrative record was such that the only medical evidence on file indicated the claimant was disabled and entitled to benefits as of 1983. Id. There was no indication in the ALJ's decision whether the ALJ had considered the claimant's improvement from 1983 to 1986 to be temporary. Id. This failure on the ALJ's part was partially the basis for remand. Id. at 1037-39.

Similarly, in King v. Astrue, 2012 WL 253411 at *6-8 (W.D.N.Y. Jan. 26, 2012), the ALJ found medical improvement when the claimant experienced a two-month period where he was off all medications and experienced no symptoms from her major depression with psychotic features. The court held this finding to be error since the record demonstrated this was only a temporary remission. Id. at *6-8. The evidence showed the claimant continued to hear voices after this two-month period. Id.

In <u>Attmore v. Colvin</u>, 827 F.3d 872, 877 (9th Cir. 2016), the court reversed with an order to reinstate benefits because the ALJ failed to consider the temporary nature of claimant's improvement. The claimant in <u>Attmore</u> had bipolar disorder. <u>Id.</u> at 874. Her medical records for the period of so-called medical improvement were mixed: sometimes the claimant was reported to be doing well, while at other times she was reportedly struggling. <u>Id.</u> The court faulted the ALJ for cherry-picking a few records showing improvement and failing to consider that evidence "in the broader context of [the claimant's] impairment." <u>Id.</u> at 877.

In <u>Nowling v. Colvin</u>, 813 F.3d 1110, 1123 (8th Cir. 2016), the court reversed and remanded because the ALJ accorded undue significance to isolated medical records showing the claimant had demonstrated "improvement" in her somatoform disorder. The court held this emphasis on isolated records failed to acknowledge that the claimant's symptoms waxed and waned throughout her substantial period of treatment. <u>Id.</u> The ALJ also failed to acknowledge the unpredictable and sporadic nature of the claimant's symptoms and the effect her structured living environment had on her symptoms. <u>Id.</u>

In <u>Hutsell</u>, 259 F.3d at 711-14, the Eighth Circuit awarded benefits outright where the claimant had a long history of mental illness with psychotic features including auditory and visual hallucinations. The ALJ failed to take into account the ameliorating effect of the claimant's structured living environment and the nature of the schizoaffective disorder itself. <u>Id.</u> Although

the claimant was able to make meals, clean, do laundry and socialize occasionally, the court noted that "it is inherent in psychotic illnesses that periods of remission will occur, and that such remission does not mean that the disability has ceased." Id. at 713 (quoting Andler v. Chater, 100 F.3d 1389, 1393 (8th Cir. 1996)).

Here, significant evidence that Ms. Darnell's condition was subject to a temporary remission rather than constituting a medical improvement is the fact that the ALJ found her to be disabled once again on October 25, 2011. Further, the ALJ found her to be disabled because she met a listed impairment, arguably indicating her impairment was worse in October, 2011, than it was in July, 2005, when she was originally found to be disabled at step five of the sequential analysis. The medical records for the period of medical improvement found by the ALJ—September 1, 2010, to October 24, 2011—are mixed. There are some records from Dr. Hasan and Dr. Everson showing relative stability. But there are other records, from Ms. Brodie and Dr. Mirza, showing severe symptoms.

A word about Global Assessment of Functioning (GAF) scores. GAF uses a scale from 0 to 100 to indicate social, occupational and psychological functioning with a 100 being the most healthy mentally. A GAF of 41 to 50 indicates serious symptoms/impairment in social, occupational, or school functioning while a GAF of 51 to 60 indicates moderate symptoms or difficulty. Nowling, 813 F.3d at 1115 n.3. A GAF of 31 to 40 indicates some impairment in reality testing or communication or major impairment in several areas, such

as work or school, family relations, judgment, thinking, or mood.  See https://www.webmd.com/mental-health/gaf-scale-facts, last checked Mar. 2, 2018.

Although GAFs were still accepted science in the 2010-11 era, both the Eighth Circuit and the Commissioner have recognized since at least 2010 that GAF scores have limited importance.  Nowling, 813 F.3d at 1115 n.3.  The "Commissioner has declined to endorse the [GAF] score for use in the Social Security and [Supplemental Security Income] disability programs and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings."  Id. (quoting Jones v. Astrue, 619 F.3d 963, 973-74 (8th Cir. 2010)).  The Diagnostic and Statistical Manual of Mental Disorders ("DSM")-IV (American Psychiatric Assn. 2000), previously contained references to GAF, but explained that GAF scores have no little or no bearing on an individual's occupational and social functioning.  Jones, 619 F.3d at 973 (quoting Kornecky v. Comm'r of Soc. Sec., 167 Fed. Appx. 496, 511 (6th Cir. 2006)).  The new DSM-5 (May, 2013), dispensed with the GAF score.

Thus, for example, Ms. Brodie's assessment of a GAF of 35 in January, 2011, and Dr. Everson's assessment of a GAF of 70 in May, 2010, are of little importance.  Nowling, 813 F.3d at 1115 n.3.  What is of greater import are the symptoms recorded at those meetings with Ms. Darnell and the action taken, if any, by the provider.  For example, even though Dr. Everson assessed a GAF of 70, he changed Ms. Darnell's psychiatric medications.  AR638.  Previously, she had been taking Lamictal, Lithium, Seroquel, Abilify, and Effexor XR.  AR614.

Dr. Everson discontinued the Lithium and Effexor XR, and continued the Lamictal, Seroquel, and Abilify.  AR638.  He then added new prescriptions of Xanax and Neurontin.  Id.  Dr. Everson would only have done this if he felt Ms. Darnell's existing medication regimen was inadequately addressing her mental impairments.

While the ALJ may have rightfully brushed aside Ms. Brodie's GAF score of 35, he failed to note something of extreme importance to ascertaining Ms. Darnell's functioning:  she had just been convicted of a felony assault on her husband, David.  AR800.  This does not bespeak an individual who is doing well in social functioning.

The court finds based upon the case law, statutes, regulations, and agency guidance that it was incumbent upon the second ALJ to evaluate whether the short-lived and sporadic improvement Ms. Darnell experienced in 2010 and 2011 was a "medical improvement" or a "temporary remission."  The substantial evidence points only to a temporary remission.  For this reason, the court agrees with Ms. Darnell that remand is warranted.  See Muncy v. Apfel, 247 F.3d 728, 733-36 (8th Cir. 2001) (reversing discontinuance of claimant's disability benefits where it was extremely unlikely the claimant's cognitive mental impairment improved 25 percent in a six-year period).

Evidence in the record supports a finding of a temporary remission. Records from Rapid City Regional Hospital Behavioral Health made note of remissions in Ms. Darnell's bipolar disorder, as noted by Dr. Bentham. AR1023.  Ms. Darnell's counsel asked Dr. Bentham specifically whether he

believed Ms. Darnell's bipolar disorder was in temporary remission between September 1, 2010, and October 25, 2011. AR1031. Dr. Bentham seemed to agree:

> ATTY: . . . Do you think it's even possible that [Ms. Darnell's] vacillating bipolar disorder could have gone into remission between September 10, 2010, and . . . October 25, 2011?
>
> ALJ: That seems like asking for a speculative answer.
>
> ATTY: Well, I'm asking his opinion, if he's able to give it, based on his knowledge and experience, training and skill with this particular disorder and . . .
>
> ME [Dr. Bentham]: I'm looking on page, again, 27 of 35 on the Rapid City Regional Hospital and you look down there past medical history, most recent episodes of bipolar in remission, 6/3/12, 4/11/12, 2/8/12; depressed with psychotic features improving, 1/12/12, 12/16/11; depressed in partial remission, 11/16/11; currently depressed with psychotic features, 10/25/11 which is what I've been using as the date.

AR1031.

What is interesting about this passage is the ALJ appears to be trying to foreclose Dr. Bentham's answer. But section 404.1594(c)(3)(iv) specifically requires the ALJ to evaluate whether the improvement is a "medical improvement" or merely a "temporary remission." Trying to foreclose the entry of relevant evidence into the record is contrary to the ALJ's duty to develop the record. Snead v. Barnhart, 360 F.3d 834, 838 (8th 2004). Nevertheless, Dr. Bentham answered the question and it appears his answer was: "Yes, there is support in the medical records for the conclusion Ms. Darnell experienced a temporary remission rather than a medical improvement." AR1031.

Dr. Pelc was asked a similar question and his answer was more concise and to the point:

ATTY:  Dr. Pelc, does one recover from a bipolar condition?

DR. PELC:  Well, it depends on what you mean by recover.  Does it go into remission?  Does the person substantially stabilize?  The answer is yes.

ATTY:  Okay, but if a person were hallucinating or hearing voices, would you consider that to be in—the conditions that you've talked about to be in remission, then?

DR. PELC:  If a person was actively having psychotic symptoms would they be in remission?  No.

AR1049.

Another material piece of the puzzle in distinguishing between "temporary remission" and "medical improvement" is Ms. Darnell's June, 2011, psychiatric hospitalization.  AR972-73.  To be fair, this evidence was never before the second ALJ, who faulted Ms. Darnell's credibility for not submitting the evidence.  AR41.  However, after the ALJ issued his decision, Ms. Darnell submitted the hospitalization records to the Appeals Council, which considered the records.  AR5, 9.

When the Appeals Council considers the new evidence but declines to grant review, the district court does not evaluate the Appeals Council's decision not to review.  Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994).  Rather, when the Appeals Council declines review, the ALJ's decision becomes the final decision of the Commissioner.  Mackey v. Shalala, 47 F.3d 951, 952 (8th Cir. 1995).  Even if the Appeals Council denies review, the evidence submitted to it becomes part of the administrative record.  Cunningham v. Apfel, 222 F.3d

496, 500 (8th Cir. 2000); <u>Nelson</u>, 966 F.2d at 366. If the Appeals Council considered the new evidence but nonetheless declined to review, then the task for the reviewing court is to consider whether the ALJ's decision is supported by substantial evidence in the record as a whole, *including* the new evidence that was not before the ALJ. <u>Cunningham</u>, 222 F.3d at 500; <u>Mackey</u>, 47 F.3d at 952; <u>Riley</u>, 18 F.3d at 622; <u>Nelson</u>, 966 F.2d at 366; <u>Browning v. Sullivan</u>, 958 F.2d 817, 822-23 (8th Cir. 1992). To an extent, this requires the court to speculate as to "how the administrative law judge would have weighed the newly submitted reports if they had been available in the original hearing." <u>Riley</u>, 18 F.3d at 622.

Given the fact the ALJ ultimately found Ms. Darnell disabled as of October 25, 2011, this court concludes that, had the ALJ considered the June, 2011, psychiatric hospitalization records, it would have found Ms. Darnell's sometimes-improved condition in 2010 and 2011 to be a temporary remission rather than a medical improvement. Accordingly, the court will remand on this issue.

The ALJ emphasized especially David Darnell's lay testimony that his wife drove their two older children to school each day and picked them up when school was out. AR41. However, being able to drop off and pick up family members on a schedule does not necessarily demonstrate one is capable of working 8 hours a day, day in and day out when one suffers from a severe mental impairment. <u>Muncy</u>, 247 F.3d at 732, 736 (reversing discontinuance of claimant's disability benefits on evidence the claimant drove his wife to work

and picked her up each day where claimant suffered from severe cognitive impairments).

Moreover, in crediting "this aspect" of David Darnell's testimony (AR41), the ALJ ignored other relevant facets of that testimony such as Ms. Darnell's inability to handle finances, her inability to handle changes in schedules, the fact she more or less lived in her bedroom almost all the time, and her hallucinations. Where a claimant suffering from mental impairments lives their life in a structured setting so as to reduce their symptoms, the ALJ must take this into account. Hutsell, 259 F.3d at 711; 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00D3a. A person diagnosed with schizoaffective disorder who lives shuttered in her bedroom will experience fewer "signs and symptoms" than one who must meet the unfiltered world out in the open day in and day out, but the relative control of symptoms should not be confused for wellness. Id. The ALJ's decision is not supported by substantial evidence.

**E.    Did the Opinions of Dr. Pelc and Dr. Bentham Support the ALJ's Decision?**

Ms. Darnell argues Dr. Pelc's opinion was insufficient to provide substantial evidence in support of the ALJ's decision because he did not consider Ms. Darnell's disability and function reports (the "E exhibits"). See AR1045 (Dr. Pelc stating he reviewed the *medical* exhibits 1F through 19F). Without considering such evidence, Dr. Pelc's decision cannot constitute "substantial evidence" according to Ms. Darnell.

Not only did Dr. Pelc not have the opportunity to consider all of the relevant evidence, Ms. Darnell points out he did not even review all of the

*medical* evidence because he did not see Dr. Hamlyn's opinion, to which the ALJ assigned "great weight." (Dr. Pelc rendered his opinions prior to the existence of Dr. Hamlyn's records and opinion). Actually, it's worse than that. Because Dr. Pelc testified he reviewed only the medical exhibits 1F through 19F, see AR1045, his opinion did not take into account medical exhibits 21F through 29F. This would include opinion evidence from Dr. Swenson, Dr. Hamlyn, and Dr. Bentham, as well as treatment records from Dr. Hamlyn and Rapid City Regional Hospital Behavioral Health. See AR841-984. Ms. Darnell argues the ALJ did not independently formulate mental RFC—he adopted Dr. Pelc's opinions--and Dr. Pelc's opinions are not substantial evidence.

Although Dr. Bentham heard Ms. Darnell's supplemental testimony at the second ALJ hearing, Ms. Darnell argues he did not indicate in any way that he took that testimony into account in forming his opinions.[32] Ms. Darnell asserts neither Dr. Pelc nor Dr. Bentham took into consideration Ms. Darnell's reduced and disrupted activities of daily living, restricted social functioning, psychotic perceptions, disturbed concentration, persistence and pace, and the effect her supportive environment had on her ability to function.

---

[32] This assertion is not borne out by the record. The ALJ made sure Dr. Bentham was on the telephone line listening in *before* Ms. Darnell testified. AR988. The ALJ then asked Ms. Darnell's attorney to summarize in advance what Ms. Darnell would be testifying to. AR989-90. The ALJ then asked Dr. Bentham whether there was any other subject matter he wished the attorney to ask Ms. Darnell about during her testimony. AR990. Clearly, the ALJ took all these steps to ensure that Dr. Bentham received relevant evidence from Ms. Darnell in order to formulate his opinions.

Furthermore, Ms. Darnell argues the ALJ relied on Dr. Bentham's opinion *only* at step three. As to mental RFC at step four, the ALJ relied *solely* on Dr. Pelc's opinions. Ms. Darnell reasons her way to that conclusion as follows. Dr. Bentham testified Ms. Darnell had "moderate" limitations in responding to usual work situations and changes in a routine work setting. AR1020-23. Ms. Darnell argues if the ALJ had relied on Dr. Bentham's opinion at step four, he would have concluded Ms. Darnell had no ability to work at any job because "moderate" limitations preclude gainful employment.

### 1. Does a Medical Expert Have to Consider Evidence Other than Medical Evidence in Completing a PRTF or Formulating Mental RFC?

The Commissioner argues 20 C.F.R. § 404.1520a requires the ALJ, not the state agency doctor, to consider all of the evidence, including the exhibit E evidence. Here, the *ALJ* properly considered all the evidence. The Commissioner concedes the fact that Dr. Pelc and Dr. Bentham failed to review all the evidence may be considered in determining what weight to accord their PRTF opinions. Nevertheless, contends the Commissioner, it does not preclude the ALJ from considering those opinions. The Commissioner argues very few of the medical sources who give opinions have seen and considered the evidence Ms. Darnell says is mandatory. Furthermore, the Commissioner points out, Dr. Pelc and Dr. Bentham's opinions were not the sole supports for the ALJ's decision. The ALJ also considered the above records from Dr. Hasan and Dr. Everson as well as each medical source who assessed Ms. Darnell's

impairments and limitations.  Of course, this is not true as to Dr. Pelc, who did

not review any information or opinions from Dr. Hamlyn.

Do medical experts hired by the Commissioner to render opinions as to

the PRTF or mental RFC have to review the claimant's testimony, disability and

function reports?  Section 404.1520a uses the pronoun "we" and promises that

"we" will consider "all relevant evidence to obtain a longitudinal picture of your

overall degree of functional limitation."  20 C.F.R. § 404.1520a(c)(1).  "We,"

"our," and "us" are defined as "the Social Security Administration" ("SSA").

20 C.F.R. 404.102.

The SSA has a Hearings, Appeals, and Litigation Law Manual (HALLEX)

that provides guidance to its employees and agents.  It is not binding on either

this court or on the SSA.  <u>Schweiker v. Hansen</u>, 450 U.S. 785, 789 (1981).

But, as with any agency, the agency's own interpretation of the statute it

implements and its own regulations has some persuasive authority.  <u>Draper v.

Colvin</u>, 779 F.3d 556, 560-61 (8th Cir. 2015) (according deference to the SSA's

interpretation of statute due to thoroughness of agency's consideration, validity

of its reasoning, consistency, formality, and expertise).  The Social Security Act

is "among the most intricate ever drafted by Congress."  <u>Schweiker v. Gray

Panthers</u>, 453 U.S. at 43.  Therefore, even though the SSA's policy and

procedure manual does not have the binding effect of law, it is nevertheless

persuasive.  <u>Draper</u>, 779 F.3d at 561 (citing <u>Davis v. Sec'y of Health & Human

Servs.</u>, 867 F.2d 336, 340 (6th Cir. 1989)).

The HALLEX provides guidance to ALJs who procure the opinions of medical experts. In doing so, the "ALJ must make every effort to obtain *all* essential documentary evidence early enough to allow the ME [medical expert] . . . sufficient time to consider the evidence before he or she responds to questions at a hearing." HALLEX at I-2-5-30A (emphasis added). The HALLEX further directs that an "ALJ will provide an ME with *any* relevant evidence that the ME will need to formulate and provide an opinion." Id. at I-2-5-38B3 (emphasis added). The ME is not required to attend the entire hearing and listen to the claimant's testimony. Id. at I-2-6-70B. However, if the ME is not present to hear the claimant's testimony, the ALJ must summarize that testimony for the ME on the record. Id. The ALJ also must "verify the ME has examined *all* medical *and other relevant evidence* of record; . . ." Id. (emphasis added). If an ME only needed to review medical records alone, it seems counterintuitive that the Commissioner would direct its employees to make sure other relevant evidence was also placed before the ME.

These quoted provisions of the HALLEX pertain to all expert testimony from an ME on any subject; it is not limited to testimony regarding mental impairments. So in interpreting what constitutes "all relevant evidence" aside from medical evidence, § 404.1520a comes into play. That provision, as well as listings 12.00C through 12.00G, make clear that in determining the impact on functioning as a result of a claimant's mental impairments, the entire longitudinal record must be considered. 20 C.F.R. § 404.1520a(c)(1). That record includes consideration of whether the claimant lives in a highly

structured setting so as to alleviate stress and minimize symptoms.  See 20

C.F.R. Part 404 Subpart P App. 1, § 12.04 (depressive, bipolar and related

disorders); 12.06 (anxiety and obsessive-compulsive disorders).

Further support for this interpretation can be found within the text of

§ 404.1520a itself.  Part (e)(5) of that section provides in pertinent part:

> If the [ALJ] requires the services of a medical expert to assist in
> applying the [psychiatric review] technique but such services are
> unavailable, the [ALJ] may return the case to the State agency or
> the appropriate Federal component. . . for completion of the
> standard [PRTF].  If, *after reviewing the case file* and completing
> the [PTRF], the State agency or Federal component concludes that
> a determination favorable to you is warranted . . .

See 20 C.F.R. § 404.1520a(e)(5) (emphasis added).  This provision clearly

requires that when a state agency ME completes the PRTF, it must review the

entire case file, not just the medical evidence within the file.

Based on a review of all the pertinent regulations and the

Commissioner's persuasive interpretation of those regulations, the court

concludes that, at a minimum, a state agency ME must review all *medical*

evidence.  Further, when assessing the functional impact of mental

impairments, "all relevant evidence" includes consideration by the ME of the

claimant's own testimony as to the effects and limitations imposed by their

mental impairment.  Were it otherwise, the Commissioner would not require

the ME to either hear the claimant's testimony at the hearing or to have the

ALJ summarize that testimony for the ME.  Were it otherwise, the

Commissioner also would not require state agency MEs to review the entire

case file in arriving at the PRTF.

There may be cases where a claimant's description of her perception of the effects of her mental impairment are adequately disclosed in her medical records. In such a case, review of medical records alone would suffice. But where a clear picture of the details of a claimant's own description of the impact her mental impairment has on her functioning is not recorded in medical records, an ME must be given access to "other relevant evidence" that includes such descriptions. This may be disability and function reports submitted by the claimant or the claimant's hearing testimony, or all three. The court does not declare that an ME must specifically review "Exhibit E" materials prior to opining about PRTF or mental RFC, only that the representative information must reach the ME in some form. Dr. Pelc's opinion is not entitled to the "great weight" given it by the second ALJ because he was a nontreating nonexamining ME, he did not review the "Exhibit E" materials or hear Ms. Darnell's testimony, he did not review the records or opinions of Dr. Hamlyn, who was a treating physician and whose opinion the ALJ gave "great weight" to, nor did he review Dr. Swensen or Dr. Doxsee's opinions, he did not review the Rapid City Regional Hospital Behavioral Health records, and, finally, he did not review the June, 2011, psychiatric hospitalization records.

Medical opinions are evidence which the ALJ will consider in determining whether a claimant is disabled, the extent of the disability, and the claimant's RFC. See 20 C.F.R. § 404.1527. All medical opinions are evaluated according to the same criteria, namely:

> --whether the opinion is consistent with other evidence in
> the record;

--whether the opinion is internally consistent;

--whether the person giving the medical opinion examined the claimant;

--whether the person giving the medical opinion treated the claimant;

--the length of the treating relationship;

--the frequency of examinations performed;

--whether the opinion is supported by relevant evidence, especially medical signs and laboratory findings;

--the degree to which a nonexamining or nontreating physician provides supporting explanations for their opinions and the degree to which these opinions consider all the pertinent evidence about the claim;

--whether the opinion is rendered by a specialist about medical issues related to his or her area of specialty; and

--whether any other factors exist to support or contradict the opinion.

See 20 C.F.R. § 404.1527(c)(1)-(6); Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007).

"A treating physician's opinion is given controlling weight 'if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007) (quoting Reed, 399 F.3d at 920); 20 C.F.R. § 404.1527(c). "A treating physician's opinion 'do[es] not automatically control, since the record must be evaluated as a whole.'" Reed, 399 F.3d at 920 (quoting Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995)).

The length of the treating relationship and the frequency of examinations of the claimant are also factors to consider when determining the weight to give a treating physician's opinion. 20 C.F.R. § 404.1527(c). "[I]f 'the treating physician evidence is itself inconsistent,' " this is one factor that can support an ALJ's decision to discount or even disregard a treating physician's opinion. House, 500 F.3d at 744 (quoting Bentley, 52 F.3d at 786; and citing Wagner, 499 F.3d at 853-854; Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005)). "The opinion of an acceptable medical source who has examined a claimant is entitled to more weight than the opinion of a source who has not examined a claimant." Lacroix v. Barnhart, 465 F.3d 881, 888 (8th Cir. 2006) (citing 20 C.F.R. §§ 404.1527)); Shontos v. Barnhart, 328 F.3d 418, 425 (8th Cir. 2003); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)).

When opinions of consulting physicians conflict with opinions of treating physicians, the ALJ must resolve the conflict. Wagner, 499 F.3d at 849. Generally, the opinions of non-examining, consulting physicians, standing alone, do not constitute "substantial evidence" upon the record as a whole, especially when they are contradicted by the treating physician's medical opinion. Wagner, 499 F.3d at 849; Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004) (citing Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999)). However, where opinions of non-examining, consulting physicians along with other evidence in the record form the basis for the ALJ's decision, such a conclusion may be supported by substantial evidence. Harvey, 368 F.3d at 1016. Also, where a nontreating physician's opinion is supported by better or

81

more thorough medical evidence, the ALJ may credit that evaluation over a treating physician's evaluation.  Flynn v. Astrue 513 F.3d 788, 792 (8th Cir. 2008)(citing Casey, 503 F.3d at 691-692).  The ALJ must give "good reasons" for the weight accorded to opinions of treating physicians, whether that weight is great or small.  Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008).

Here, the ALJ gave "great weight" to both Dr. Pelc's opinion and to Dr. Hamlyn's opinion, yet those opinions are in complete contradiction as to whether Ms. Darnell was disabled from September 1, 2010, to October 24, 2011.  Dr. Hamlyn opined she was, and Dr. Pelc opined she was not.  The ALJ never resolved this conflict.  Dr. Hamlyn's opinion, as a treating physician, was entitled to greater weight so long as it was supported by medical findings and was not inconsistent with the record as a whole.  Dr. Pelc's opinion was not entitled to controlling weight because he was a consultant only and did not consider the entirety of even the medical evidence.

### 2.    Did the ALJ Rely Solely on Dr. Pelc's Opinion at Steps 4 & 5?

Ms. Darnell emphasizes that the ALJ relied on Dr. Bentham's opinion, but only as to step three of the sequential analysis.  Dr. Bentham opined Ms. Darnell had "moderate" difficulties accepting constructive criticism or accepting instructions.  If the ALJ had accepted Dr. Bentham's opinion at steps four and five Ms. Darnell argues, the ALJ would have concluded she was not able to perform any work on a consistent basis.  Therefore, Ms. Darnell asserts, the ALJ had to have relied solely on Dr. Pelc's opinion in formulating RFC.

The mental RFC formulated by the ALJ assessed Ms. Darnell to have the capacity for "occasional to frequent contact with supervisors, coworkers and the public and . . . [to] understand, remember and carry out three step instructions."  AR38.  This had to have been based upon Dr. Pelc's opinions, not Dr. Bentham's, argues Ms. Darnell.  Dr. Bentham did not opine Ms. Darnell had the capacity to have contact with supervisors, coworkers and the public on an occasional-to-frequent basis.  The crux of Ms. Darnell's argument hinges on the supposition that one having "moderate" difficulties getting along with others in the workplace results in the conclusion there are no jobs that person can do.

Ms. Darnell cites <u>Titus v. Callahan</u>, 133 F.3d 561 (8th Cir. 1997) for the proposition that "moderate" difficulties getting along with others in the work place means there are no jobs a claimant can do.  In <u>Titus</u>, at the ALJ hearing, the VE had testified that "as far as the physical exertion, it would seem to me that someone having moderate difficulty accepting constructive criticism or accepting instructions would not be" employable.  <u>Id.</u> at 564 n.6.  The ALJ rejected the VE's testimony, reasoning that the claimant had "numerous" past jobs and was able to perform those jobs.  <u>Id.</u> at 564.  The court noted the claimant's past jobs showed she had great difficulty working with others and remanded for the ALJ to consider Titus' past employment history before arriving at a conclusion.  <u>Id.</u> at 565.

The VE in <u>Titus</u> qualified its opinion:  "as far as the physical exertion" someone with "moderate" difficulties getting along with others in the work

setting would eliminate any jobs they could do.  Id. at 564 at n.6.  That does

not exactly answer the question whether "moderate" difficulties in getting along

with others at work always disqualifies everyone from ever obtaining a job.

Nevertheless, the court need not resolve that precise issue because

Dr. Bentham's opinion suffers from the same infirmities as Dr. Pelc's vis-à-vis

Dr. Hamlyn's opinion.  The ALJ accorded "great weight" to all three opinions,

yet, as discussed above, Dr. Hamlyn found Ms. Darnell to be disabled from

September 1, 2010, to October 24, 2011, and Dr. Bentham did not.  The ALJ

never acknowledged this conflict between Dr. Bentham's opinion and

Dr. Hamlyn's opinion, let alone resolve it.[33]  Remand is accordingly necessary.

## F. Was a Finding of Disability Required Based on the ALJ's Evaluation of Dr. Hamlyn's Opinion?

Dr. Hamlyn, a treating psychiatrist, found Ms. Darnell met the C criteria.

He diagnosed Ms. Darnell with schizoaffective disorder, describing features that

met the C criteria in listing 12.03.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1,

---

[33] The Commissioner also asserts the second ALJ's decision was supported by the opinions of Dr. Stacy, Dr. Doxsee, Dr. Hasan, and Dr. Everson.  The court does not discuss these individually because none of them, with the exception of Dr. Hasan, was a treating medical source and none of them considered Dr. Hamlyn's records because each of their opinions were issued before Ms. Darnell saw Dr. Hamlyn for the first time in October, 2011.  AR664-66 (Dr. Stacy's opinion—July 27, 2010); AR810-11 (Dr. Doxsee's opinion—March 7, 2011); AR634-38 (Dr. Everson's single treatment record—May 5, 2010). Dr. Hasan was a treating physician, but he appears to be a general practitioner because he treated Ms. Darnell for all manner of ailments.  Under the Commissioner's regulations, Dr. Hamlyn's opinion is entitled to greater weight on the subject of Ms. Darnell's mental impairments because he specializes in that type of medicine.  See 20 C.F.R. § 404.1527(c).  Finally, like the opinions of Drs. Bentham and Pelc, the opinions of Stacy and Doxsee conflict directly with Dr. Hamlyn's opinion of disability for the period September 1, 2010, to October 24, 2011.  The ALJ never addressed this conflict.

§ 12.00G2.  He also said, restrospectively, she would have had more than 3 absences from work per month between September, 2010, and October, 2011, thus rendering her unable to work.  The ALJ unqualifiedly gave Dr. Hamlyn's opinion "great weight."  AR46.  The ALJ did not reject any part of Dr. Hamlyn's opinions.  Yet the ALJ found Ms. Darnell to be nondisabled.  Ms. Darnell argues you cannot reconcile the ALJ's conclusion of nondisability from September 1, 2010, to October 24, 2011, with giving "great weight" to Dr. Hamlyn's opinion.

The Commissioner points out that Dr. Hamlyn did not begin treating Ms. Darnell until October 25, 2011, the date the ALJ concluded Ms. Darnell once again became disabled.  AR46.  That is why the ALJ gave Dr. Hamlyn's opinion "great weight."  But, the Commissioner argues, the ALJ was justified in not crediting Dr. Hamlyn's "purely speculative" opinion that Ms. Darnell would have missed 3 or more days of work per month a year prior, when Dr. Hamlyn was not even treating her at that time.  The Commissioner asserts Dr. Hamlyn just checked a box that plaintiff's lawyer had filled in with the September, 2011, date.  His opinion does not indicate he had reviewed records of other professionals who had been treating Ms. Darnell in September, 2011.  He did not explain what the basis for this opinion was.  AR907.  For these reasons, the Commissioner argues, the ALJ was justified in disregarding the retrospective portion of Dr. Hamlyn's opinion.

Ms. Darnell argues in reply that the Commissioner's suggestion that the ALJ rejected the retrospective portion of Dr. Hamlyn's opinion is a *post hoc*

rationalization. When reviewing agency decisions, such justifications are not acceptable.

In <u>Burlington Truck Lines, Inc. v. United States</u>, 371 U.S. 156 (1962), the Supreme Court addressed this issue. The Court noted the Administrative Procedures Act allows court to determine whether agencies have properly exercised their discretion within the bounds expressed by the legislative delegation of power. <u>Id.</u> at 167-68. In order for courts to make this determination, the agency must "disclose the basis of its order." <u>Id.</u> at 168. "The agency must make findings and support its decision, and those findings must be supported by substantial evidence." <u>Id.</u> Where the agency did not express a particular rationale for its decision, and counsel on appeal supplied a rationale, the Court rejected counsel's *post hoc* rationale because it was never expressed by the agency in its decision. <u>Id.</u> "The courts may not accept appellate counsel's *post hoc* rationalizations for agency action; . . . an agency's discretionary order [must] be upheld, if at all, on the same basis articulated in the order by the agency itself." <u>Id.</u> at 168-69.

The ALJ's assignment of "great weight" to Dr. Hamlyn's opinion was not qualified in any way. AR46-47. For the Commissioner to suggest before this court that, in fact, the ALJ rejected the retrospective portion of Dr. Hamlyn's opinion because it was unsupported is a *post hoc* rationale supplied for the first time herein. The ALJ's decision does not reveal any such discounting or partial rejection of the opinion of Dr. Hamlyn. The court rejects this rationale.

So, also, the Commissioner's argument that the ALJ disregarded Dr. Hamlyn's retrospective opinion because it was "checkbox opinion." This rationale is nowhere to be found in the ALJ's written opinion. In fact, the ALJ gave "great weight" to Dr. Doxsee's opinion, just like he did for Dr. Hamlyn's opinion, and Dr. Doxsee's opinion is also a checkbox form.[34] AR810-11. Even if the "checkbox" and "restrospective" aspects of Dr. Hamlyn's opinion were recognized and taken into account by the ALJ, those reasons alone would not have justified discounting Dr. Hamlyn's opinion.

A medical source statement (MSS) "is a checklist evaluation in which the responding physician ranks the patient's abilities, and is considered a source of objective medical evidence." Leckenby, 487 F.3d at 628 n.3. When a treating physician submits a MSS, i.e. a check-the-box opinion, it is still entitled to controlling weight if the opinions expressed thereon are supported in the physician's treatment records or supported by "objective testing or reasoning" and are not inconsistent with the record evidence. Id. at 632. The court reversed and remanded where an ALJ rejected MSSs from Leckenby's three treating physicians where the opinions expressed in the MSSs enjoyed support both in the physicians' treatment records and in the other record evidence. Id. at 633, 635. Here, the Commissioner points to nothing in Dr. Hamlyn's treatment records that is inconsistent with or undermines his opinions expressed in the MSS. That distinguishes this case from Holmstrom

_____

[34] Like Dr. Hamlyn, Dr. Doxsee's opinion could be interpreted along with a narrative record. AR823.

v. Massanari, 270 F.3d 715, 720-21 (8th Cir. 2001), where the checkbox opinions of treating physicians were inconsistent with the medical evidence as a whole and were based on short-term treating relationships.

Furthermore, there is nothing inherently unreliable or untrustworthy about a physician's retrospective opinion. Retrospective opinions by treating physicians are not necessarily automatically discarded; neither are they automatically given controlling weight. The Eighth Circuit has stated that retrospective opinions have probative value when they are supported by diagnostic testing. See Robson v. Astrue, 526 F.3d 389, 393 (8th Cir. 2008). Where, for example, the claimant does not have contemporaneous objective medical evidence of the onset of the disease, but the presence of the disease is confirmed, "the ALJ must consider all of the evidence on the record as a whole, including . . . the retrospective conclusions and diagnosis of her doctor." Grebenick v. Chater, 121 F.3d 1193, 1199 (8th Cir. 1997).

Where the onset date is critical, the court requires retrospective opinions as to disability onset date to be corroborated, such as through lay observations by family members. List v. Apfel, 169 F.3d 1148, 1149 (8th Cir. 1999); Jones v. Chater, 65 F.3d 102, 104 (8th Cir. 1995). The court has even, on "unusual" occasion, credited retrospective physicians' opinions *without* corroboration by lay testimony where the unique debilitation caused by the disease is not reasonably questionable. List, 169 F.3d at 1149 (post-polio syndrome).

In Jones, where the ALJ rejected a treating physician's retrospective opinion, but failed to discuss corroborating evidence from relatives who knew

the claimant from before his alleged onset date through the end of his insured status, the court reversed and remanded.  <u>Jones</u>, 65 F.3d at 104.  On the other hand, an ALJ's rejection of a physician's retrospective opinion was affirmed on appeal where the claimant sought no medical treatment for some period of time before, on and after the alleged disability onset date.  <u>Ponder</u>, 770 F.3d at 1194.

In <u>Basinger v. Heckler</u>, 725 F.2d 1166, 1168 (8th Cir. 1984), the claimant was found to be suffering from certain diabetes-related conditions including diabetic eye changes, diabetic neuritis, and arteriosclerosis in 1980.  His insured status had ended in 1978, but had had not seen any doctor between 1973 and 1980, partly owing to finances and partly owing to stubbornness (according to his wife).  <u>Id.</u> at 1167, 1170.  Two of his doctors opined that the diabetic conditions Basinger exhibited in 1980 would have taken at least 5 and in most cases 10 years to develop.  <u>Id.</u> at 1168.  The doctors' retrospective opinions were supported by lay testimony from Basinger's family.  <u>Id.</u> at 1168-70.  The court reversed and remanded, holding the ALJ had erred in failing to give adequate consideration to the two physicians' retrospective opinions and that of the lay witnesses.  <u>Id.</u> at 1170.

Similarly, in <u>Cunningham v. Apfel</u>, 222 F.3d 496, 501-04 (8th. Cir. 2000), the claimant's first application for benefits was denied and, at the Appeals Council's suggestion, she filed a second application with a disability onset date the day after the first ALJ's decision.  The Eighth Circuit awarded benefits outright on the basis of the claimant's mental and physical

impairments and her treating physician's retrospective opinion as to her condition at the disability onset date.  Id.

The court agrees with Ms. Darnell.  Giving Dr. Hamlyn's opinion unqualifiedly "great weight" cannot be reconciled with the ALJ's decision finding Ms. Darnell to have been not disabled from September 1, 2010, to October 24, 2011.  There is no indication whatsoever in the record that the ALJ chose to disregard or discount Dr. Hamlyn's opinion on the basis it was retrospective or merely a "checkbox" opinion.  Remand is warranted.

## G.    Type of Remand

Ms. Darnell seeks an order reversing the ALJ and directing SSA to reinstate Ms. Darnell's benefits from September 1, 2010, to October 24, 2011. No alternative request is made.

For the reasons discussed above, the Commissioner's partial denial of benefits is not supported by substantial evidence in the record. Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration.  It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands.  A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling.  Buckner v. Apfel, 213

F.3d 1006, 1010 (8th Cir. 2000). A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings. Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." Buckner, 213 F.3d at 1011. In cases where there has been an improper denial of benefits, but there is not overwhelming evidence to support a disability finding by the Court, the proper course is to remand for further administrative findings. Id.; Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted for the reasons discussed at greater length above. Furthermore, with the addition of the June, 2011, psychiatric hospitalization records, the evidence is overwhelming, and the conclusion is inescapable: Ms. Darnell experienced a temporary remission, not a medical improvement. Holmstrom, 270 F.3d at 721, 723 (reversing for an outright award of benefits where claimant's mental impairments were disabling despite his continued and increasing doses of psychiatric medications over several years); Hutsell, 259 F.3d at 711-14 (reversing for an outright award of benefits where the claimant had a long history of psychotic mental impairments and had been taking psychiatric medications for years which helped but did not eliminate her symptoms); Cunningham, 222 F.3d at 501-04

(reversing for an outright award of benefits where Commissioner found claimant disabled at a later date and, as to the earlier date, ALJ failed to consider claimant's mental impairments and those mental impairments clearly showed claimant was disabled). Therefore, a remand with instructions to enter a finding of disability for the interim period from September 1, 2010, to October 24, 2011, is appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, it is hereby

ORDERED that the plaintiff's motion to reverse [Docket 12] is GRANTED and the Commissioner's decision is REVERSED and REMANDED for an award of benefits for the period from September 1, 2010, through October 24, 2011.

DATED March 13, 2018.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge